439 A.2d 652

Robert E. J. CURRAN, Appellant,

v.

PHILADELPHIA NEWSPAPERS, INC., a/k/a The Philadelphia Inquirer.

Robert E. J. CURRAN, Appellant,

v.

PHILADELPHIA NEWSPAPERS, INC., d/b/a The Philadelphia Inquirer, a Pennsylvania Corporation.

Supreme Court of Pennsylvania.

Argued Oct. 26, 1981.

Decided Dec. 22, 1981.

Reargument Denied Jan. 29, 1982.

James J. Binns, Philadelphia, Garland D. Cherry, Media, for appellant.

David H. Weinstein, Samuel E. Klein, David H. Marion, Philadelphia, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and WILKINSON, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

These are libel actions brought by the former United States Attorney for the Eastern District of Philadelphia,

appellant Robert Curran, against the publisher of The Philadelphia Inquirer, appellee Philadelphia Newspapers, Inc. In the first action, appellant seeks damages for articles published by appellee in April of 1976 which reported appellant's resignation from office. In the second action, appellant seeks damages for an article published by appellee in September of 1976 reporting remarks made by appellant's successor in office, David Marston, Esquire.

Although the two actions are based on appellee's coverage of separate events, both actions ultimately are controlled by the issue of whether appellant has met the "actual malice" standard of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). An equally divided Superior Court has upheld orders of the Court of Common Pleas of Delaware County entering summary judgments in both actions in favor of appellee.[1] We conclude that summary judgment was proper in the first action, as appellant's own evidence defeated the claimed actual malice in appellee's coverage of appellant's resignation. However, we agree with appellant that summary judgment was inappropriate in the second action, as the issue of actual malice in appellee's coverage of David Marston's remarks should have been left for resolution by a jury. Hence we affirm the order of the Superior Court entered in the first action. We vacate the order entered in the second, and remand for further proceedings.

## I. Appellant's Resignation

Appellant was appointed to office in August of 1972. On March 31, 1976, one day before a scheduled meeting in Washington, D. C., with his supervisor, Deputy Attorney General Harold Tyler, appellant publicly announced his resignation from office, effective April 30, 1976.

1. 261 Pa.Super. 118, 395 A.2d 1342 (1978). Judge Spaeth filed an Opinion in Support of Affirmance in which Judge Van der Voort joined. Judge (now President Judge) Cercone concurred in the result. Judge Hester filed an Opinion in Support of Reversal in which President Judge Jacobs and Judge Price joined. Judge Hoffman did not participate in the consideration or decision of the case.

On April 1, the date of appellant's scheduled meeting with Harold Tyler, appellee published an article on the resignation. The article, written by Janice Schaffer, a reporter and staff writer for appellee, quoted appellant as having stated that the resignation was " 'entirely' voluntary." Further quoting appellant, the article stated:

" 'It absolutely took everybody by surprise. . . . It was no secret that my term runs out in August and no secret that I was thinking of leaving. It was just a question of when.' "

The article immediately added:

"Other federal sources, however, said that if Curran had not resigned, he would have been asked to resign at a meeting he had scheduled today with Harold Tyler, deputy attorney general with the Justice Department."

According to the article, appellant described the information supplied by the "other federal sources" as " 'ridiculous,' " and added that the scheduled meeting with Tyler was to have involved "office business." The article further stated that Tyler "could not be reached for comment," and that Tyler's assistant, William Gray, "declined to comment."

The following day, April 2, appellee published a brief report on a statement made by a spokesman for Tyler denying that Tyler had planned to ask for appellant's resignation. According to the report, the spokesman for Tyler said that appellant had requested the meeting "to discuss several investigations pending in the office."

On Sunday, April 4, appellee's "In Passing" column, a review of the previous week's news, contained a two-paragraph summary of its first report on appellant's resignation. After repeating appellant's assertion that the resignation was "entirely voluntary," the summary added:

"Federal sources, however, said that the Justice Department was unhappy with Curran and was about to ask him to resign."

The summary made no mention of the statement of the spokesman for Tyler denying that Tyler had planned to ask for appellant's resignation.

On August 27, 1976, appellant filed a complaint against appellee in the Court of Common Pleas of Delaware County. According to the complaint, appellee "did not receive any information from 'federal sources' indicating that Harold Tyler would ask plaintiff to resign . . . ," and the report in appellee's April 1 article that appellant would have been asked to resign was a "false and malicious statement" which appellee had "purposely manufactured." Appellant demanded a jury trial.

Appellee denied appellant's allegations in a timely answer. Appellee also raised new matter which alleged that the coverage of appellee's resignation was not published with the actual malice required under *Times v. Sullivan*, supra.

## II. Marston's Remarks

On September 23, 1976, four weeks after the filing of appellant's first complaint, a federal grand jury returned an indictment charging Theodore Rubino, Chairman of the Republican Party of Chester County, with extortion. Appellant's successor, David Marston, immediately held a press conference to explain the charge. In attendance was Janice Schaffer, appellee's staff writer who had written the April 1 article which formed the basis for appellant's first complaint.

The following day, September 24, appellee published an article on the Rubino indictment. Listed as co-authors were Schaffer and another staff writer, Robert Frump. After describing the details of the indictment, the article stated:

"Marston, who replaced former U. S. Attorney Robert Curran on June 30, also made reference to accusations that Curran did not vigorously pursue white-collar crimes if the suspects were politically well-connected. Both Curran and Marston were appointed by Republican administrations.

" 'There is no place for politics in prosecution,' Marston said of the accusations. 'If it's a political corruption case and we can make it, we'll make it.' "

Two days later, on Sunday, September 26, appellee ran a brief article entitled "Clearing the Record." This article stated that its previous story on the Marston press conference had incorrectly reported that Marston had made reference to accusations regarding appellant's reluctance to prosecute certain white-collar offenses. According to the article, "Marston commented only generally on politics and prosecutions, with no reference to accusations about Curran."

On October 5, 1976, appellant filed a second complaint against appellee. In this second complaint, appellant alleged that Marston had made no reference to accusations that appellant would not pursue white-collar crimes if the suspects were "politically well-connected." Appellant claimed that the statement in the article to the contrary was "falsely manufactured . . . solely for the purpose of doing reputational harm to Plaintiff . . . ." Appellant also alleged that "at the time of the press conference, it was clearly indicated that the investigation of Rubino was actually begun in December, 1975, while Plaintiff was U. S. Attorney." Appellant claimed that this fact had been "deliberately, wilfully and maliciously omitted" from the article on the press conference.

As in the previously filed complaint, appellant demanded a jury trial. Also as before, appellee denied appellant's allegations and raised new matter contending that the requisite malice was lacking.

### III. Appellant's Evidence

The two actions proceeded together through the pre-trial stage of litigation. On December 7, 1976, in an effort to substantiate his first complaint, appellant took the deposition of James Seif, Special Assistant to the Assistant Attorney General of the Criminal Division, Richard Thornburgh (now Governor of Pennsylvania). As "Special Assistant," Seif ranked immediately below the Assistant Attorney General. Seif not only organized the work of the Criminal Division and reviewed all mail addressed to the Assistant Attorney General, but also served as an advisor to the Assistant Attorney General and was familiar with personnel problems within the Division.

On examination by appellant, Seif testified that on March 31, 1976, he had received a phone call from Anthony Lame, a reporter for appellee. As in previous conversations, Seif and Lame discussed "general information" relating to the Criminal Division. Additionally, according to Seif, when Lame told him of appellant's resignation, Seif responded, "Well, it's a good thing he did, because they would have thrown his ass out of here if he hadn't." Seif said that his conversation with Lame was reflected in the statement in appellee's April 1 article that if appellant had not resigned he would have been asked to do so. Seif disclaimed responsibility for the specific information that Tyler would have requested appellant's resignation at the April 1 meeting.

On December 15, 1976, appellant filed a "Notice of Taking of Depositions" pursuant to Pa.R.Civ.Proc. 4007 (now 4007.-1). Included among the proposed deponents were Anthony Lame, appellee's reporter who had spoken with Special Assistant Seif, and Janice Schaffer, appellee's reporter who had been named as the author of the April 1 article and the co-author of the September 24 article. The parties stipulated that the depositions would be taken on January 11, 1977.

On January 5, 1977, shortly before the date scheduled for depositions, appellee filed petitions for a change of venue and, in the alternative, petitions for the special assignment of a visiting judge. Appellee simultaneously filed motions for a protective order pursuant to Pa.R.Civ.Proc. 4012 staying appellant's taking of depositions until the alternative petitions were resolved. According to appellee, a stay of the scheduled depositions until resolution of the alternative petitions was necessary because the scheduled depositions of its employees would require "prompt rulings" on a number of issues, including the scope of "privileged communications." Although appellant filed answers opposing the alternative petitions, he did not answer the motions for protective orders. Depositions were not taken on the scheduled date.

No formal action on appellee's alternative petitions appears of record. However, all orders of court entered after the filing of the alternative petitions were signed by a judge

from another county, Judge Wickersham of the Court of Common Pleas of Dauphin County (now of the Superior Court). The date of Judge Wickersham's appointment is not clear.

On February 3, 1977, appellee filed motions in both cases for summary judgment. Accompanying appellee's motions were the affidavits of the two employees of appellee that appellant had sought to depose, Anthony Lame and Janice Schaffer, and two other employees, John Severson and Robert Frump. Severson claimed to be the author of the "In Passing" column in the Sunday, April 4, edition of appellee's newspaper which repeated the story on appellant's resignation. Frump was named as co-author of the September 24 article on the Marston remarks.

Lame, Schaffer, and Severson gave statements relating to the preparation of appellee's coverage of appellant's resignation. All three insisted that the coverage of appellant's resignation had been prepared and published in good faith. Schaffer and Frump gave statements relating to appellee's coverage of the Marston remarks. They attributed the false statements in the September 24 article to a misunderstanding on the part of Frump, the alleged author of the article.[2] Schaffer concluded her affidavit by stating her belief that, while he was in office, appellant had engaged in a pattern of conduct designed to deprive appellee of "access to news of legitimate and important public interest and concern."

**2.** Schaffer stated that the reference in the September 24 article to appellant's reluctance to prosecute certain white-collar offenses was the result of a misunderstanding between her and Robert Frump, actual author of the September 24 article, to whom she had conveyed her notes on the Marston press conference. Schaffer claimed that, upon reading the September 24 article, she immediately sought to correct the misinformation contained in the September 24 article. She claimed authorship of the "Clearing the Record" column, which allegedly was included in appellee's Sunday edition because of its wide circulation. In his affidavit, Robert Frump claimed knowledge that federal officials had been dissatisfied with appellant's performance. He stated that, on the basis of this claimed knowledge, he regarded the general remarks of Marston conveyed to him by Schaffer as specific references to appellant.

As of the date that appellee filed its motions for summary judgment and supporting affidavits, appellant had not taken the previously scheduled depositions of appellee's employees. When appellee filed its motions for summary judgment, it also filed "supplemental" motions for protective orders. In these supplemental motions, appellee alleged that its motions for summary judgment and affidavits demonstrated the absence of material issues of fact, and that the depositions of its employees which appellant had previously scheduled would "shed no further light on the issues . . . ." According to appellee's supplemental motions, "unless and until plaintiff can demonstrate that a material triable issue remains for disposition by the Court," appellee should not be put to the "burden and expense of protracted discovery proceedings . . . ." Appellant did not contest the allegations contained in appellee's supplemental motions.

Appellant filed affidavits in opposition to appellee's motions for summary judgment in which he addressed the merits of his complaints. As to the complaint challenging appellee's coverage of appellant's resignation, appellant filed his own affidavit in which he stated that he had planned to resign from office for some time prior to his public announcement on March 31. He stated that, in a conversation with appellee's reporter Schaffer that same day, he had told Schaffer that her sources were wrong, and that he had personally requested the scheduled meeting with Harold Tyler. Appellant also submitted the affidavit of his former assistant, J. Clayton Undercofler, Esquire. This affidavit states that appellant had scheduled the meeting with Harold Tyler before appellant announced his resignation. The affidavit further states that, on the date of the announcement of the resignation, Undercofler spoke with appellee's reporter Schaffer. According to Undercofler, Schaffer told Undercofler that she had information that appellant had resigned because appellant was going to be fired by Tyler, and that the purpose of the meeting scheduled for April 1 was to fire appellant. Undercofler's affidavit states that he told Schaffer that the story was untrue, and that the purpose of

the scheduled meeting was to discuss office matters. Undercofler states that he told Schaffer to call Tyler's assistant Gray, who would confirm both that the scheduled meeting was to involve office matters, and that appellant was not going to be fired. A third affiant for appellant, former Assistant U. S. Attorney Joseph Fioravanti, stated that, on the morning of April 1, he had received a phone call from Schaffer. According to this affidavit, Schaffer told Fioravanti that Tyler's assistant Gray had confirmed that appellant had called the April 1 meeting. According to the affidavit, when asked if Tyler expected to request appellant's resignation at the meeting, Gray said that he "could not" comment and that Schaffer would have to consult with appellant.

As to the complaint challenging appellee's coverage of the Marston remarks, appellant's affidavit states that the investigation into the activities of Theodore Rubino had begun well before he resigned from office. According to appellant, in December of 1975, Fioravanti informed appellant that the FBI had information possibly linking Rubino to criminal conduct. Appellant stated that he had personally "participated in the decision making process concerning that investigation during the time that I served as head of the office," and that in February or March of 1976 he had assigned Assistant U. S. Attorney William Winning to aid Fioravanti in the investigation. In an affidavit filed on behalf of appellant, Winning stated that he had attended the Marston press conference along with Janice Schaffer and other reporters. After stating that Marston had made no mention of appellant, either "directly or indirectly," Winning stated:

"At some point in the news conference, Jim Smith of The Philadelphia Daily News asked when and how the investigation concerning Mr. Rubino was begun by Federal authorities. It was related to all in attendance at the press conference by Mr. Marston and myself that the indictment was the result of an extensive continuing investigation into allegations of corruption in Chester County and that the investigation of Rubino began approximately in December of 1975 . . . ."

## IV. Inapplicability of *Herbert v. Lando*

Before we discuss the actions in light of the actual malice standard of *Times v. Sullivan*, we must first address appellant's contention that the scope of his deposition-taking was improperly limited. Appellant asserts that under *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), he is permitted to take the depositions of appellee's reporters who were responsible for appellee's coverage of appellant's resignation and the Marston remarks. According to appellant, this deposition evidence was essential to the proper determination of the motions for summary judgment.

As appellant correctly asserts, *Herbert v. Lando* holds that a plaintiff who is obliged to establish actual malice on the part of a media defendant is not barred by the federal Constitution from "inquiring into the editorial processes of those responsible for the publication . . . ." 441 U.S. at 154, 99 S.Ct. at 1638. Here, however, appellant failed to pursue such an inquiry.

Appellee's supplemental motions for a protective order specifically alleged that appellant had not sufficiently demonstrated the "material triable issue" purportedly necessary for the taking of depositions from appellee's reporters. At the time of this litigation, Pa.R.Civ.Proc. 4013 provided:

> "The filing of a motion or application under this chapter shall stay the proceedings with respect to the depositions or discovery to which the motion or application is directed . . . ." [3]

Thus, although appellee's filing of the supplemental motions worked an automatic stay of appellant's deposition-taking, see *Lapp v. Titus*, 224 Pa.Super. 150, 302 A.2d 366 (1973), appellant was in no respect foreclosed from voicing his objection to appellee's claim that deposition-taking was barred by the absence of a material triable issue. Indeed, under Pa.R.Civ.Proc. 1035(e), appellant was specifically entitled to voice objection:

3. Present Rule 4013, effective April of 1979, provides to the contrary.

"Should it appear from a party opposing the motion [for summary judgment] that he cannot *for reasons stated* present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

(Emphasis added.) See 2 Goodrich-Amram 2d § 1035(e): 1 (1976). Appellant's submission of affidavits addressing the merits of the complaint, therefore, requires the conclusion that appellant was content to proceed to disposition of the motions for summary judgment on the basis of the materials filed with the court, and without the depositions of appellee's reporters. This trial strategy is binding on appeal. See, e.g., *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).[4]

### V. No Actual Malice in Coverage of Appellant's Resignation

The challenged coverage of appellant's resignation included the following statement, which was published on April 1, 1976:

"Other federal sources ... said that if Curran had not resigned, he would have been asked to resign at a meeting he had scheduled today with Harold Tyler, deputy attorney general with the Justice Department."

The challenged coverage concluded on Sunday, April 4, 1976, in appellee's "In Passing" column, which contained the summary that "Federal sources ... said that the Justice Department was unhappy with Curran and was about to ask him to resign," but did not make reference to Tyler's denial, published April 2, that appellant would have been fired.

Throughout these proceedings appellant has claimed the existence of actual malice in the coverage of his resignation. Such a claim, however, will not suffice to withstand a

4. Our disposition makes it unnecessary to decide whether, under Pennsylvania's "Shield Law," 42 Pa.C.S. § 5942, appellant would have been permitted to depose appellee's reporters.

motion for summary judgment. " 'The . . . mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Phaff v. Gerner*, 451 Pa. 146, 151, 303 A.2d 826, 829 (1973), quoting Fed.R.Civ.Proc. 56, Notes of Advisory Committee. Accord, Goodrich-Amram 2d, supra, § 1035(d): 1 at p. 456. Summary judgment is to be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.Civ.Proc. 1035(b).

Under the actual malice standard of *Times v. Sullivan*, a public official such as appellant can recover damages for a defamatory falsehood relating to official conduct only if the public official proves that the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. Accord, e.g., *Wolston v. Readers Digest Ass'n*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proximire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Herbert v. Lando*, supra. See, e.g., *Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626 (1972). The inquiry, therefore, is whether the evidence submitted to the court on a defendant's motion for summary judgment would permit the plaintiff to meet the actual malice standard.

Summary judgment is proper "only if the evidence then before the court is such as would warrant the granting of a defendant's point for binding instructions after trial." *Bremmer v. Protected Home Mutual Life Ins. Co.*, 436 Pa. 494, 497, 260 A.2d 785, 786 (1970). Thus

"[s]ummary judgment is granted only in the clearest of cases, where the right is clear and free from doubt. *Kotwasinski v. Rasner*, 436 Pa. 32, 258 A.2d 865 (1969); *Prince v. Pavoni*, 225 Pa.Super. 286, 302 A.2d 452 (1973). The moving party has the burden of proving the non-existence of any genuine issue of fact. *Kent v. Miller*, 222 Pa.Super. 390, 294 A.2d 821 (1972); *Moore v. Zimmerman*,

221 Pa.Super. 359, 292 A.2d 458 (1972); *Schacter v. Albert,* 212 Pa.Super. 58, 239 A.2d 841 (1968). All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party. *Ritmanich v. Jonnel Enterprises, Inc.,* 219 Pa.Super. 198, 280 A.2d 570 (1971)." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 204, 412 A.2d 466, 468–69 (1979).

So viewing the evidence relating to appellee's April 1 article on appellant's resignation, appellant informed Schaffer that his decision to resign had been wholly voluntary, that he was not about to be fired, and that he had scheduled the April 1 meeting with Tyler to discuss office matters. Appellant's assistant Undercofler similarly advised Schaffer. And, according to former Assistant U. S. Attorney Fioravanti, Schaffer stated that Tyler's assistant Gray had confirmed that appellant was responsible for calling the April 1 meeting and had expressed an inability to comment on whether Tyler would have asked for appellant's resignation at the meeting.

■ This, however, is not the extent of appellant's evidence. · Appellant's deponent James Seif, Special Assistant to the Assistant Attorney General, expressly stated that he had said to appellee's reporter Anthony Lame that appellant would have been asked to resign if he had not done so. Even when read in the light most favorable to appellant, Seif's deposition testimony establishes that, although Seif did not speak directly to Schaffer, Seif was a source for appellee's statement on April 1 that appellant would have been asked to resign if he had not done so.[5] Moreover, Seif

5. Seif's statement that appellant would have been asked to resign if he had not done so does not supply appellee with the defense of truth. As the Restatement (Second) of Torts states,

"[i]t is necessary to find that the defamatory matter contained in the statement is true. When one person repeats a defamatory statement that he attributes to some other person, it is not enough for the person who repeats it to show that the statement was made by the other person. The truth of the defamatory charges that he has thus repeated is what is to be established."

was second in rank within the Criminal Division, below only the Assistant Attorney General. Seif directly assisted and advised the Assistant Attorney General. Seif was familiar not only with general office procedure but also with the inner workings of the Division, including personnel problems. Seif had displayed his familiarity both in previous conversations with appellee's reporter and in the conversation during which Seif stated that appellant would have been asked to resign.

 Thus, appellant's deposition evidence establishes that Seif was a reliable source of information. "Where . . . the adverse party makes admissions either in his pleadings or in response to requests for admissions, or in answers in interrogatories or depositions, these admissions . . . may afford a sound basis for summary judgment." Goodrich-Amram 2d, supra, § 1035(b): 5 at p. 435. See also id., § 1035(d): 1 at p. 455 (same rule for admissions contained in adverse party's affidavits).

The actual malice standard of *Times v. Sullivan* permits no recovery for the publication of information, obtained from a reliable source, which directly relates to a public official's conduct in office. Indeed, publication of such information in justified reliance on a source is wholly the antithesis of publication with knowledge that the information is false. Nor can it be said that publication in justified reliance on a source displays reckless disregard of whether such information is true or false. The Supreme Court has emphasized that the question of whether a statement has been published with reckless disregard of falsity "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publica-

§ 581A Comment e. Moreover, the evidence indicates that Seif was in a position neither to discharge appellant nor to say with absolute certainty what the future would have held for appellant.

tion." Id. Accord, *Time, Inc. v. Pape*, 401 U.S. 279, 291–92, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971). Thus, while "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports," *St. Amant v. Thompson*, supra, 390 U.S. at 732, 88 S.Ct. at 1326, it simply cannot be concluded that a defendant entertained the requisite doubt as to the veracity of the challenged publication where the publication was based on information a defendant could reasonably believe to be accurate.

■ It is true that, before appellee's publication of the report that appellant would have been asked to resign, appellant specifically denied the report, as did his assistant Undercofler. Moreover, the record indicates that the spokesman for Tyler, who purportedly would have asked for appellant's resignation the next day, had refused to comment. However, contrary to the assertion of appellant, neither the pre-publication denials nor the refusal to comment served to cast sufficient doubt upon the veracity of the April 1 publication to make the issue of actual malice a question for a jury. The refusal of Tyler's spokesman to comment neither undermined nor contributed to the veracity of the report. Moreover, the denials of appellant and his assistant, when weighed against the information supplied by Seif, could reasonably have been dismissed as subjective statements not impeaching the integrity of the information supplied by the federal source. As one court has stated, "[i]f potential plaintiffs in libel suits could cut off a [no] malice defense simply by calling a newspaper and giving a broad denial of an article, the first amendment policy in *New York Times* would be undermined." *Martin Marietta Corp. v. Evening Star Newspaper, Inc.*, 417 F.Supp. 947, 960 (D.D.C. 1976).

■ It is also true that in his deposition Seif acknowledged only that he had supplied the information that appellant would have been asked to resign, and that he disclaimed responsibility for the additional details that Tyler would have asked for the resignation at a meeting on April 1, the

day after it had been submitted. However, appellee's inclusion of the additional details beyond the scope of the information supplied by Seif does not assist appellant's cause in establishing actual malice. Appellant's own affidavits indicate that appellee's reporter Schaffer had knowledge of the existence of the meeting. Reasonably viewed, the specific information that Tyler would have asked for the resignation at the meeting was not by itself defamatory. Rather, the information merely embellished the report that appellant would have been asked to resign if he had not done so. Because that portion of the report which was capable of a defamatory meaning was based upon a reliable source, inclusion of the non-defamatory embellishment cannot subject appellee to liability.

■ Appellant cites the final passage of the affidavit of appellee's reporter Schaffer as supporting evidence for sending to a jury the issue of actual malice in the coverage of his resignation. In that passage, Schaffer expresses the view that appellant frustrated appellee's newsgathering efforts while he was in office. However, even on a view of the evidence in the light most favorable to appellant, Schaffer's observation displays only that Schaffer possibly would seek revenge for appellant's tactics. Such a motive would not establish actual malice. As the Supreme Court of the United States has observed,

> "[u]nder a rule ... permitting a finding of malice based on an intent merely to inflict harm, rather than an intent to inflict harm through falsehood, 'it becomes a hazardous matter to speak out against a popular politician, with the result that the dishonest and incompetent will be shielded.' Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875, 898 (1949)."

*Garrison v. Louisiana,* 379 U.S. 64, 73–74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). See *Henry v. Collins,* 390 U.S. 856, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).

The existence of a reliable source for the report that appellant would have been asked to resign precludes a finding of actual malice. There is, therefore, no basis for

sending the issue of actual malice in appellee's April 1 coverage of appellant's resignation to a jury.

Appellee's April 4 coverage similarly presents no jury question. The challenged publication states that "Federal sources . . . said that the Justice Department was unhappy with Curran and was about to ask him to resign." As in the case of the April 1 publication, appellant's own evidence revealed that Special Assistant Seif was a source for this statement, and that appellee could reasonably have relied upon Seif. Although a spokesman for Tyler had issued a statement on April 2 on behalf of Tyler, that statement indicated only that Tyler had not intended to ask for appellant's resignation at the meeting on April 1st. No actual malice, therefore, has been established.

### VI. Actual Malice in Coverage of Marston Remarks Presents Jury Question

▮▮▮▮ Appellant's challenge to appellee's article of September 24 stands on a far different footing. The September 24 article stated that, at a press conference on the indictment of Chester County G.O.P. Chairman Theodore Rubino, Marston had "made reference to accusations that Curran did not vigorously pursue white-collar crimes if the suspects were politically well-connected." Additionally, Marston allegedly "said of the accusations" that " 'There's no place for politics in prosecution.' "

Had Marston in fact made these remarks, appellee would not be exposed to liability.

"The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."

Restatement (Second) of Torts, supra, § 611. See *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53 (1971); *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586 (1963). However, it is undisputed that Marston made no reference to appellant and instead made only general comments on the

prosecution of public officials. Unlike the coverage of appellant's resignation, in which the information supplied by appellee's source was embellished by non-defamatory statements, here the embellishment itself was defamatory. Appellee, therefore, is subject to liability if the evidence would permit the conclusion that it acted with actual malice "in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement." Restatement (Second) of Torts, supra, § 611 Comment b.

There is no dispute that appellee's reporter Schaffer attended the Marston press conference. Also in attendance was William Winning, who states in his affidavit on behalf of appellant that it was made clear at the conference that the investigation which culminated in the indictment of Rubino had begun in December of 1975. From this evidence, a jury could reasonably conclude that Schaffer was aware that appellant had been in office at that time, and that she consciously ignored the probable falsity of her interpretation of Marston's remarks.

Appellee strenuously urges that, when the affidavits of its two reporters Schaffer and Frump are considered, it is clear that the September 24 article was a product of a misunderstanding between the two. Appellee misperceives the evidentiary force of its own testimonial affidavits.

"Testimonial affidavits of the moving party or his witnesses, not documentary, even if uncontradicted, will not afford sufficient basis for the entry of summary judgment, since the credibility of the testimony is still a matter for the jury."

Goodrich-Amram 2d, supra, § 1035(b): 4 at pp. 434–35. That trial by testimonial affidavit is prohibited "cannot be emphasized too strongly." Goodrich-Amram, supra, § 1035(d): 1 at p. 455.

The prohibition against reliance upon the testimonial affidavits of the moving party is derived from the famed case of *Nanty-Glo Borough v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932). That case involved a plaintiff's effort to obtain a directed verdict on the basis of the plaintiff's

uncontradicted evidence. The trial court granted the verdict, but this Court reversed:

"In the words of Justice SHARSWOOD, 'However clear and indisputable may be the proof when it depends on oral testimony, it is nevertheless the province of the jury to decide, under instructions from the court, as to the law applicable to the facts, and subject to the salutary power of the court to award a new trial if they should deem the verdict contrary to the weight of the evidence': *Reel v. Elder*, 62 Pa. 308. * * * The credibility of these witnesses, without whose testimony plaintiff could not have recovered, was for the jury and plaintiff's motion for binding instructions should not have been granted."

309 Pa. at 238, 163 A. at 524. Since 1932, this Court has consistently adhered to the Nanty-Glo rule, most recently in *Thompson Coal Co. v. Pike Coal Co.*, supra (1980).[6]

We are satisfied that case law of the Supreme Court of the United States supports our adherence to the Nanty-Glo rule in this controversy over the existence of actual malice. Recently, in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the Supreme Court "express[ed] some doubt" about the "rule" favoring the use of summary judgment in determining whether a plaintiff has adequately shown actual malice under *Times v. Sullivan*:

"The proof of 'actual malice' calls a defendant's state of mind into question, *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710 [11 L.Ed.2d 686] (1964), and does not readily lend itself to summary disposition. See 10 Wright & Miller, Federal Practice & Procedure § 2730, at 590–592."

443 U.S. at 120 n.9, 99 S.Ct. at 2680 n.9. More significant, in *St. Amant v. Thompson*, supra, the Supreme Court specifically stated that the defendant in a defamation action cannot insure a favorable verdict "by testifying that he

6. See also, e.g., *McElhenny v. Iliff*, 436 Pa. 506, 260 A.2d 739 (1970); *Varallo v. Pennsylvania R. R. Co.*, 424 Pa. 1, 225 A.2d 552 (1967); *Exner v. Safeco Ins. Co.*, 402 Pa. 473, 167 A.2d 703 (1961); *Jablonski v. Jablonski*, 397 Pa. 452, 155 A.2d 614 (1959).

published with a belief that the statements were true." 390 U.S. at 732, 88 S.Ct. at 1326. Rather, "[t]he finder of fact must determine whether the publication was indeed made in good faith." Id. Thus, just as the Nanty-Glo rule is derived from a case where a plaintiff requested a directed verdict, a prohibition against reliance upon testimonial affidavits of the party moving for summary judgment in an actual malice controversy can be derived directly from the language of the Supreme Court in *St. Amant.*

## VII. Conclusion

Because the record establishes that appellant's own evidence defeats his cause of action challenging the coverage of his resignation, the order of the Superior Court at No. 1475 October Term, 1977, is affirmed. Because no such evidence of record appears in the challenge to the coverage of the Marston remarks, and appellee as moving party may not prevail solely upon its own testimonial affidavits, the order of the Superior Court at No. 1476 October Term, 1977, is vacated. The order of the Court of Common Pleas of Delaware County at No. 76–13449 granting appellee summary judgment is also vacated, and the record is remanded to the Court of Common Pleas of Delaware County for proceedings consistent with this opinion.

Order at No. 1475 October Term, 1977, affirmed. Order at No. 1476 October Term, 1977, vacated, and record remanded for proceedings consistent with this opinion.

KAUFFMAN, J., did not participate in the consideration or decision of this case.

NIX, J., filed a concurring and dissenting opinion.

NIX, Justice, concurring and dissenting opinion.

I join the majority in its findings that appellant has not met the "actual malice" standard of *New York Times Co. v.*

*Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) in the first action.

I further believe appellant has not met the "actual malice" standard of *New York Times* in the second case. When a libel suit is brought for publication of information regarding a public official's conduct in office, the *plaintiff* has the burden of showing "that the publisher was aware of the likelihood that he was circulating false information." *St. Amant v. Thompson* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

The majority suggests that 1) the conceded fact that remarks attributed to David Marston, Esquire at a press conference on September 26, 1976 were not made by Marston, 2) appellee's reporter Schaffer was present at the press conference and 3) appellant's affiant, William Manning deposed: ". . . it was made clear at the conference that the investigation which culminated in the indictment . . . had begun in December of 1975" constitute that quality of proof required of the plaintiff to support a finding that the false publication "was made with a 'high degree of awareness of . . . probable falsity.'" as required by *Time v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson, supra;* and *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). I do not agree that this is sufficient to establish that appellee consciously ignored the probable falsity of the publication. I believe, as did the Superior Court, that appellant failed to produce sufficient evidence to support the vital "actual malice" ingredient of his case.

In the words of Mr. Justice Brennan in *New York Times v. Sullivan, supra,* 376 U.S. at 273, 84 S.Ct. at 722 ". . . neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct."

I would have affirmed the order entered in the second action.