421 A.2d 346

**Mamie FARLEY**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY and Richard Harrow, Jr.**

**Appeal of SEPTA.**

**Richard HARROW, Jr.**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY and Henry T. Plonski, Appellants.**

Superior Court of Pennsylvania.

Argued March 21, 1979.

Filed Aug. 1, 1980.

Reargument Denied Oct. 7, 1980.

Petition for Allowance of Appeal Denied April 10, 1981.

572

Norman M. Hegge, Jr., Philadelphia, for appellants.

Richard W. Berlinger, Philadelphia, for Mamie Farley, appellee.

Joseph Litt, Philadelphia, for Richard Harrow, Jr., appellee.

Before CERCONE, President Judge, and WATKINS and HOFFMAN, JJ.

WATKINS, Judge:

These are appeals growing out of a trespass action in an intersectional vehicular accident. The cases were consolidated for trial. Richard Harrow, Jr., the plaintiff–appellee, sued the defendant, Henry T. Plonski, a bus driver and his employer, Southeastern Pennsylvania Transportation Authority (SEPTA), for injuries he sustained when his car was struck by a bus, owned by SEPTA and operated by Plonski. Richard Harrow, Jr., was brought in as an additional defendant on the basis that he contributed or was fully responsible for the accident, but the court below during trial entered a non–suit.

The jury returned verdicts in favor of Harrow in the amount of $10,000 and in favor of Farley in the amount of $25,000. Post–trial motions for judgment notwithstanding

the verdict and for a new trial were denied and judgments were entered on the verdicts.

■ The facts briefly as stated by the court below are as follows:

"On June 2, 1971, at approximately 12:30 P.M., the plaintiff, Richard Harrow, Jr., was proceeding along Green Street in an easterly direction. At the same time, the defendant, Plonski, was operating a Septa bus in a southerly direction on 23rd Street. The intersection of 23rd and Green Streets only has a stop sign for Green Street. Mr. Harrow came to a complete stop at the corner and looked at the left. What he saw was Mr. Plonski waving his arm to indicate that it was alright (sic) for the plaintiff to proceed through the intersection. At this point the bus was approximately three (3) or four (4) car lengths from the corner, was moving at about five (5) miles per hour, and was continuing to slow down as if to stop when it reached Green Street. The plaintiff, seeing no other traffic, and having received the go ahead from the bus driver drove his 1968 Ford into the intersection. At a point a little more than halfway through the intersection, Harrow's car was struck by the bus on the rear portion of the driver's side of the vehicle. The bus was damaged on its right front side. Both vehicles were being driven down the center lanes of what are three (3) lane streets. The remaining four (4) outer lanes are used for parking.

"Just after the accident, the plaintiff got out of his car but before he could take more than a few steps he collapsed into unconsciousness and was rushed to the hospital. Insofar as the bus is concerned, while the driver was not hurt, four (4) passengers, including the other plaintiff, Mamie Farley, were injured."

Under these facts there is no merit in the motion for judgment notwithstanding the verdict and the court below properly denied it.

We will discuss the questions involved as to a new trial as follows:

A. The learned trial judge erred in refusing to charge the jury that Richard Harrow, Jr., had a continuing duty to look for approaching traffic as he entered the intersection regardless of any signals he allegedly received from the bus operator and his failure to do so was negligence.

Harrow testified that after he received the hand signal from Plonski he did not look back for other traffic on 23rd Street since he was looking at the bus and that was the only possible traffic. The bus was several car lengths away and it would serve no purpose if Plonski had given him the go ahead signal. SEPTA argues that its vehicle had the right of way but Harrow testified he had come to a complete stop and looked to his left and saw Plonski waving him ahead. The bus was being driven slowly and according to Harrow seemed to be slowing down to stop at Green Street so he drove into the intersection. He was a little more than halfway through the intersection when he was struck by the bus on the rear portion of the driver's side of his car. The damage to the bus was on its right front side.

Harrow had a right to assume that Plonski would not move into the intersection if the jury believed that he had been given the go–ahead signal. SEPTA argues that Plonski had the right of way and could not give it up. As the court below commented: "This theory would permit a defendant to proceed with reckless abandonment knowing that whatever occurred he could not be held responsible. Fortunately such is not the law." *Peters v. Shear*, 351 Pa. 521, 526, 41 A.2d 556 (1945) where the court stated:

> " 'A right–of–way' possessed by a motorist, is like a green light, not a command to proceed but a qualified permission to do so . . . A motorist, regardless of his possessing a theoretical 'right–of–way' must exercise such due care as is required by the situation confronting him."

The court below properly refused this point for charge.

B. The Learned trial court erred in charging that even though the bus driver had the right of way he was required to have his vehicle under such control as to avoid

the accident. This charge was proper. See *Peters v. Shear, supra.*

C. The Learned trial judge erred in permitting Harrow to testify regarding his alleged loss of vision over a three year period without requiring competent medical testimony to show that such an injury was the natural and probable consequence of the accident.

We quote with approval from the disposition made of this complaint by the court below as follows:

"The testimony at trial established that when the plaintiff collapsed in the street immediately after the accident he was rushed to Hahnemann Hospital. When he became conscious he complained of a severe headache and that his left eye hurt. He was hospitalized for nine days during which time a head wound was stitched up, his eye was treated with medication, he had numerous skull x–rays taken and a compress was kept on his eye during his entire stay. When the plaintiff left the hospital he was still suffering from the headaches and a partial loss of vision. In addition to Harrow's own testimony, all of this was admitted into evidence as part of the medical records submitted at the trial.

"The plaintiff also testified that before the accident he had never had any problems with his head or, in particular, his eyes. He also noted that as a result of instructions given to him by the treating physician he did not seek additional attention for his eye but rather waited for the problem to clear up on its own. This occurred approximately three years after the accident.

"The defendants argue that expert medical testimony is mandatory in order to connect the injury to the accident. Such is not the law in this Commonwealth.

"In *Simmons v. Mullen*, 231 Pa.Super. 199, 212 [, 331 A.2d 892] (1974), the court said:

"Clearly, a plaintiff has the burden of establishing that injuries were proximately caused by the defendant's negligence. Medical testimony, however, is not always necessary to make the causal link ... Expert testimony [is]

not required to show proximate cause. Since [if] the injury was so 'immediately and directly or naturally and probably', the direct result of the accident ... Only when the cause of the injury is not readily apparent is there a need for medical testimony.'

"Since the above stated medical history clearly indicates a firm basis for concluding that the accident caused eye injury, defendant's fourth reason for a new trial is denied."

■ The most serious question raised in this appeal is the decision by the court below to permit the jury to determine whether a proper excuse had been made for the failure of the appellant to produce Plonski, the bus driver, and his instruction to the jury if they found that the explanation was not satisfactory an adverse inference could be drawn from his failure to testify.

We find this to be error.

"It is the general rule that where a party fails to produce evidence which is within its control and would naturally be in his interest to produce and *he fails to give any satisfactory reason for the omission,* the jury had a right to infer that the evidence, if produced, would have been unfavorable to him; in such case the inference is permissive not conclusive." *Davidson v. Davidson,* 191 Pa.Super. 305, 156 A.2d 549 (1959) (Emphasis–the writer's). See also, *Bentivoglio v. Ralston,* 447 Pa. 24, 27, 288 A.2d 745 (1972).

This is perhaps the most important piece of evidence in this case in determining negligence as the testimony of the plaintiff Harrow was that this witness, the bus driver, had signalled him to go ahead. This, with the failure of the witness to appear, remains unrebutted even though certain passengers in the bus testified that they did not see the signal. An examination of this record shows clearly the reason for his non–appearance and the determination of whether the reasons advanced were satisfactory should have been made by the court. It appears to be a similar decision to be made by the court as the determination of competency

of a minor and if the court held the excuse to be reasonable the jury could not have been advised as to the inference.

SEPTA called Elizabeth Adomanes, a registered nurse, to verify the medical records showing the reason Plonski left SEPTA. He had suffered a right hemiplegia with aphasia, commonly known as stroke. His condition was known to both sides. The crucial testimony upon which the court relied was given by a Samuel B. Atkins who was employed by SEPTA as a process server. He visited Plonski at his home on Friday, September 30, 1977, and testified in court the following Monday. Portions of his testimony are as follows:

Mr. Lachat:

Q. How about his facial features, Mr. Atkins?

A. Yes. It was not the best.

Q. Could you describe what you mean by that a little more particularly? What was different about his face from the normal face?

A. Oh, his face was to the angle, as though he has to keep his head at a certain angle.

Q. Did you attempt to communicate or speak with Mr. Plonski?

A. I did.

Q. Could he speak back to you?

A. No.

Q. You mentioned that his wife was present?

A. Right.

Q. Could she kind of communicate with him?

A. She could understand him.

Q. Did he mumble or anything like that?

A. Right. He had a low tone mumble.

Q. Could you understand him?

A. I couldn't understand him, no.

Mr. Plonski had to be assisted into the room by his wife and neighbors.

THE COURT: What could you see about him when you saw him? What was he doing, walking, jumping around or what?

THE WITNESS: He had to be assisted into the front room by his wife and neighbors and he sat there and to me he held his head at an angle and his hand was and I know he had suffered.

Only his wife was able to understand the few mumbles and groans which he made.

Mr. Berlinger:

Q. And his wife translated that to you to say he's not well.

A. He's not well.

Q. Now, how long did you stay there?

A. Approximately twenty to twenty–five minutes.

Q. And did you carry on a conversation of sorts with Mr. Plonski?

A. With Mr. Plonski and then with his wife.

Q. What sort of things did you talk about?

A. Well, mostly she did the talking about his condition and what had happened over the years to him.

Q. How many comments or how much did you actually say directed at Mr. Plonski as opposed to Mrs. Plonski?

A. I suppose I directed about in twenty minutes maybe ten questions.

Q. And he would respond in the same fashion through his wife?

A. Through his wife.

Q. Did these responses indicate to you that he understood your questions?

A. No. No.

Q. What would happen? Give us an example of a question that you asked him and that he didn't understand.

A. I asked him how long was he on active duty as an operator, and then he responded by saying what hospital he had been in.

Q. Were you able to understand anything that Mr. Plonski said?

A. No.

The trial judge in his opinion concentrated on certain portions of his testimony as follows:

Mr. Berlinger:

A. Maybe be being assisted by his neighbor and his wife, I think, which I'm positive one of them had the cane, and when he took his seat I think they just set him there and he simply rest on it. But when he got up he took it up with the left hand.

Q. Oh, he stood up in your presence?

A. Yeah, he got up.

Q. Did he get up by himself?

A. Yeah, with the assistance of his walker he sprung up.

Q. Out of his chair?

A. Right.

Q. What kind of a chair was he seated in?

A. He was seated in something like a rocker, wooden—

Q. A rocking chair?

A. Yes.

He also commented on the fact that on an earlier visit to Plonski's home by Mr. Atkins, he did not appear to be at home. However, there is nothing in the record that would show that he was not actually in the house.

Under the record in this case "satisfactory reasons for the failure of Plonski to testify are obvious and the jury should never have been instructed as to permissive inferences because of his failure to testify.

The other questions raised are without merit.

The judgments entered on the verdicts are reversed and new trials granted.

CERCONE, P. J., and HOFFMAN, J., concur in the result.