543 A.2d 1078

**Richard A. SPRAGUE, Appellant,**

v.

**Greg WALTER, Kent Pollock, Howard Shapiro, Eugene L. Roberts, Jr., Creed C. Black, Michael Pakenham, Aaron Epstein, Philadelphia Newspapers, Inc., and Knight Newspapers, Inc., Appellees.**

Supreme Court of Pennsylvania.

May 31, 1988.

426

James E. Beasley, William P. Murphy, Philadelphia, for appellant.

Samuel E. Klein, Frank L. Corrado, Jr., Philadelphia, for amicus curiae—The Greater Phila. Chapter of the American Civil Liberties Union.

Before NIX, C.J., and FLAHERTY, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This is an appeal by allowance from an order of the Superior Court granting a new trial in a libel action against a newspaper. The issues presented arise from evidentiary rulings by the trial court. Review was granted because the issues herein implicate the relationship between the federal and state constitutional provisions relating to free speech and reputation and the statutorily created privilege conferred upon a media defendant, commonly known as the "Shield Law." It has become increasingly apparent that the confines of that privilege must be more clearly delineated. It is appropriate to begin with a summary of the procedural history which provided the setting for the trial rulings that are here for consideration.[1]

In 1973 one Richard A. Sprague, Esquire, commenced a libel action against Philadelphia Newspapers, Inc. ("PNI"), publisher of the *Philadelphia Inquirer*, a daily newspaper of general circulation. Sprague's complaint, filed in the Court of Common Pleas of Philadelphia County, alleged

---

1. An extensive recitation of the facts of this case may be found in the Superior Court's opinion, reported at 357 Pa.Super. 570, 516 A.2d 706 (1986).

that he had been falsely and maliciously defamed by two series of articles published by the newspaper in late March and early April 1973. Also named as defendants in the suit were various reporters and editors of the *Inquirer*, as well as the corporate owner of PNI. Of the reporters named as defendants, Greg Walter, Howard F. Shapiro and Kent Pollock were the actual authors of the allegedly defamatory articles. At the time the newspaper articles were published Richard Sprague was First Assistant to the District Attorney of Philadelphia. Prior to attaining that position, he had been chief of the homicide division of the District Attorney's Office.

The first series of *Inquirer* articles concerning Sprague, published in late March of 1973, indicated that he, while First Assistant District Attorney, had participated in a certain illegal wiretapping scheme. In April of 1973, the *Inquirer* followed with a series of articles which related that Sprague, at a time ten years prior when he was chief of the homicide division, had prevented the bringing of homicide charges against the son of a certain high official of the Pennsylvania State Police. This second series of articles conveyed the impression that Sprague's treatment of the homicide case was motivated by personal favoritism toward the official. The *Inquirer* articles implicating Sprague in the wiretapping episode were written partly by reporter Greg Walter and partly by reporter Howard Shapiro; the articles about the ten-year old homicide case were co-authored by Walter and another reporter, Kent Pollock.

The libel action here involved proceeded to trial before a jury; those proceedings lasted more than six weeks and generated over four thousand pages of transcribed testimony. The plaintiff, Sprague, presented evidence tending to show that the imputations of wrongdoing set forth about him in the *Inquirer* articles were false. He also produced evidence which, if believed, would support an inference that the newspaper articles were published with knowledge of their falsity or with reckless disregard of their truth or falsity, *i.e.*, that the statements were made with "actual

malice." As part of his proof on the issue of malice, Sprague disclosed that, several months before the appearance of the articles in question, he had successfully prosecuted reporter Greg Walter on criminal charges for illegal wiretapping. In that regard, the defamation plaintiff also presented testimony from Walter's former girlfriend which indicated that the reporter had expressed a desire to "get Sprague" because of the prosecution.[2]

To meet the case put on by the plaintiff, PNI sought to negate an inference of "actual malice." To that end, the defense undertook to establish that the newspaper articles were not statements made with knowledge of their falsity, or made with reckless disregard of whether they were false or not, but rather were good-faith statements honestly based on information supplied by reliable and confidential "sources." In support of this contention, the first witness called by the defense was reporter Kent Pollock, co-author of some of the articles.

In the course of Pollock's testimony on direct examination, defense counsel alluded to one of the articles concerning the homicide case and asked the witness to relate how he obtained the information put forth in the article. In response, Pollock began by stating that the information had come from "an individual" to whom he had spoken. When the reporter sought to continue by recounting *what* the unnamed person had told him, the trial judge interrupted with an inquiry as to *the informant's identity.* Pollock answered the court's question by stating: "This is a person who was very close to [the suspect's] family, sir, who is a source of mine." At that point, counsel for the plaintiff demanded that the witness reveal the identity of the mentioned informant. Defense counsel objected to the demand, asserting that reporter Pollock had a legal privilege, embodied in Pennsylvania's Shield Law, not to divulge his confi-

2. Following the presentation of Sprague's case-in-chief, a non-suit was granted as to PNI's corporate owner. As to the other defendants, Sprague entered into a stipulation whereby he would drop them from the case, upon the condition that he be permitted to try the case as if they were still parties.

dential sources. The trial judge then recessed the proceedings, to conduct an *in camera* hearing as to the merits of the objection.

During the *in camera* hearing before the trial court, defense counsel asserted·that the Shield Law permitted reporter Pollock to testify fully as to the information obtained from his source without having to disclose the source's identity, and that no adverse inference or other sanction should result from the exercise of the privilege. The defendant further contended that the privilege conferred by the Shield Law is one mandated by the First Amendment of the United States Constitution, and that if the exercise of the privilege impedes a plaintiff's ability to question the reliability or genuineness of a newsman's source the balance should be struck to favor the free flow of information to the media. The plaintiff, on the other hand, argued that the Shield Law did not demand the interpretation sought by the defendant, and that the privilege is merely an investigative tool which is dissipated once the information from the source is put into print and published. Counsel for the plaintiff further argued that the remedy for failure to reveal a source should be an "adverse inference" charge by the court.

Upon considering the competing arguments, the trial court ruled in favor of the plaintiff. The court concluded that the Shield Law was inapplicable and that the defendant had no constitutional right to conceal the identity of its sources. Based on that determination, the court ordered the defendant to disclose its sources. The order further stated:

> If the defendant chooses not to reveal their [sic] sources, it is precluded from defending this action on the grounds that the articles in the suit, or any portion thereof, were based upon information received from a reliable, but undisclosed source.

> In order to implement this Order, all evidence of what information defendants [sic] received from allegedly reliable, but undisclosed sources, shall be excluded.

Notwithstanding the above mandate, reporter Pollock and another reporter-witness, Robert J. Terry, persisted in asserting the Shield Law when asked, on cross-examination, to name the sources of the information contained in the newspaper articles. The record shows that the defense witnesses invoked the Shield Law twenty-six times during cross-examination by the plaintiff.

Because the defendant had elected not to disclose its sources, the trial judge, at the time of charging the jury, applied the sanction prescribed in his order: all evidence derived from such sources was to be excluded from the jury's consideration. The jury was instructed to disregard all testimony of defense witnesses as to what information had been obtained from unnamed sources. The court then proceeded to specify for the jurors the items of evidence to be stricken:

(1) The contents of a document, mentioned in one of the articles, purportedly linking plaintiff Sprague to the illegal wiretapping scheme. This document was testified to by reporter Pollock, but he refused to reveal its source.

(2) Testimonial reference by Pollock to a statement in one of the articles that Sprague had boasted of his influence with the father of the suspect in the homicide case. Pollock refused to disclose the identity of the person who supposedly heard Sprague's remarks.

(3) Testimonial reference by Pollock to a statement in one of the articles that Sprague had spent an entire day at the home of the father of the homicide suspect. Pollock refused to disclose the source of the statement.

(4) Testimonial reference by Pollock to information he allegedly received from a "contact" close to the family of the homicide suspect. Pollock declined to identify the "contact."

(5) Testimonial reference by reporter Robert Terry to information received from an unnamed source about the homicide case. Terry refused to identify the source.

The trial court's charge was designed to implement its earlier ruling as to the consequences of a refusal by PNI to

disclose the identity of its sources. The plaintiff would have had the court go further with its charge, and instruct that the failure to reveal sources would warrant a finding "that there were no sources." The court refused that request.

As noted, *Inquirer* reporter Greg Walter had authored some of the allegedly defamatory articles and had co-authored others. He also had been credited with doing most of the investigative work which preceded them. According to the plaintiff, the articles were shaped in large part by Walter's ill-will toward him. It is thus apparent that Walter was a key figure in the litigation. However, he was never called as a witness at trial. Prior to the commencement of trial, defense counsel stated to the court that Walter could not appear as a witness, for reasons of health. Because of that representation, plaintiff's counsel, in his case-in-chief, resorted to reading into the record segments of a partially completed deposition which had been taken from Walter. However, at a later point in the trial, counsel for the plaintiff expressed doubts about Walter's physical infirmity; and indicated to the court that the reporter was then currently travelling about the state and writing newspaper articles. At the plaintiff's request the trial court issued a subpoena to secure the courtroom presence of Greg Walter, so that a determination could be made as to his physical condition.

Walter complied with the subpoena and appeared in court at the requested time with his physician, Dr. Fred D. Holford. At that point, the defense presented the court with a letter from Dr. Holford stating that he had performed a second arterial coronary bypass on Walter, and that it would be medically inadvisable for the reporter to undergo the stress of being a trial witness. The defense also offered to have Dr. Holford testify *in camera;* but that request was denied by the court, ruling that such evidence had to be presented in open court before the jury. In the view of the trial judge, the question of whether Walter should be deemed unavailable for reasons of health

was for the jury to determine. Notwithstanding the court's ruling in this regard, the defendant declined to have Dr. Holford testify before the jury to substantiate its assertion about Walter's condition.

Although Walter himself remained in the courtroom for the rest of the trial, neither party called him to testify about the newspaper articles. However, the trial court accepted the plaintiff's argument that Walter was within the control of PNI, that Walter's testimony properly would have been a part of PNI's case, and that PNI had failed to establish that the reporter was medically unavailable as a witness. The court, having accepted the above assertions, proceeded to grant the plaintiff's request for a "missing witness" or "adverse inference" charge. That is, the court instructed the jury that the failure of the defendant, PNI, to call Walter as its witness permitted an inference that his testimony would have been unfavorable to the defendant.

The jury's deliberation of the case resulted in a verdict for the plaintiff and an award of $4,500,000. The award consisted of $1,500,000 as compensatory damages and $3,000,000 as punitive damages. PNI followed with motions for a judgment *non obstante verdicto* and for a new trial. Those motions were denied by a court *en banc*. From the order denying post-trial relief PNI appealed to the Superior Court, which, upon review, affirmed in part and reversed in part.

The Superior Court determined that the common pleas court was correct in denying PNI's motion for a judgment n.o.v. In that regard, the Superior Court extensively and thoroughly recounted the evidence, and concluded that the plaintiff's proof was sufficient to create a jury question as to defamation, falsity and "actual malice," even under the standard of proof dictated by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). However, with regard to the applicability of the Shield Law and the propriety of the "adverse inference" charge relating to reporter Greg Walter, the Superior Court decided that the trial court had committed reversible error in both

respects. Accordingly, the Superior Court granted PNI a new trial.

Our first departure with the analysis employed by the Superior Court in its resolution of the matter is its "broad" interpretation of the privilege provided under the Shield Law. Section 5942 of the Judicial Code, 42 Pa. C.S. § 5942, which throughout this lawsuit has been referred to as the "Shield Law", provides in pertinent part:

**Confidential communications to news reporters**

**(a) General rule.**—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.[3]

The clear language of section 5942(a) provides that persons covered by it are not required *to disclose the source* of the information "in any legal proceeding, trial or investigation before any government unit." This language is in no way ambiguous and its direction is clear. It was obviously designed to protect the confidentiality of the source, and we are constrained under the rules of statutory interpretation to accept its plain meaning. 1 Pa. C.S. § 1921. A broad interpretation of the privilege provided under the section which would require either the acceptance of the reliability of the unidentified source, or the verification of the content of the communication, is not warranted by the language of the section nor any precedent in this jurisdiction.

---

**3.** Subsection (b) of this provision provides the following exception not relevant to our present inquiry.

> **(b) Exception.**—The provisions of subsection (a) insofar as they relate to radio or television stations shall not apply unless the radio or television station maintains and keeps open for inspection, for a period of at least one year from the date of the actual broadcast or telecast, an exact recording, transcription, kinescopic film or certified written transcript of the actual broadcast or telecast.
> 42 Pa.C.S. § 5942(b).

■ Traditionally, the recognition of privileged information in this Commonwealth has been designed to permit uninhibited disclosure between parties sharing a unique relationship. *See, e.g.,* 42 Pa.C.S. §§ 5916, 5928 (attorney-client); 42 Pa.C.S. § 5923 (husband-wife); 42 Pa.C.S. § 5929 (physician-patient); 42 Pa.C.S. § 5943 (priest-penitent). Because our society is also one that encourages an open interchange of ideas between its members and seeks to maintain the free flow of such ideas to the media, there is an equally strong societal purpose in fostering uninhibited disclosure between individuals and the media. *See, e.g., Hatchard v. Westinghouse Broadcasting Co.,* 516 Pa. 184, 532 A.2d 346 (1987); *In re Taylor,* 412 Pa. 32, 193 A.2d 181 (1963). The language of our Shield Law reflects this purpose by protecting the media against the forced disclosure of the identity of its sources. This particular privilege was clearly designed to be an absolute one in that it immunizes the media against any legal compulsion directed at requiring disclosure of the source of the information. However, it is not a necessary corollary to such a privilege that its exercise also carries with it a verification of the reliability of the information received or the reliability of the source from which the communication was received. Nor does the language of the Shield Law reflect that such was the intention of the legislature.

An inference can only be appropriately drawn when the predicate upon which it rests supports its validity. *See Henderson v. National Drug Co.,* 343 Pa. 601, 23 A.2d 743 (1942); *Hodgson v. Bigelow,* 335 Pa. 497, 7 A.2d 338 (1939); *Hornick v. Bethlehem Mines Corp.,* 307 Pa. 264, 161 A. 75 (1932). In contrast, the Shield Law privilege was designed to encourage communication from even the most unsavory sources. To assume the veracity of the information supplied would presume the trustworthiness of the source and the validity of the informant's judgment in assessing the facts upon which the information was based. Such a proposition would require not only a blind faith in the integrity of the informant but also in the accuracy of his judgment. The bearing of false witness has always been abhorrent to

our Judaic–Christian concept of fairness. The requirement of an oath or affirmation, and our laws protecting against perjury or false statements, reflect our continuing concern for the trustworthiness of assertions of fact offered in judicial proceedings. To accept the Shield Law privilege as attesting to the reliability of the source as well as protecting its identity not only extends the plain language of the provision without justification, but would also sanction the creation of an inference entirely lacking in foundation. Such a result is offensive to settled rules of statutory construction, 1 Pa.C.S. § 1922(1), and would undermine the integrity of our fact finding process.

In attempting to justify its adoption of an expansive reading of our Shield Law provision, the Superior Court relied heavily upon the language appearing in our decision in *In re Taylor, supra,* and its own ruling in *Hatchard v. Westinghouse Broadcasting Co.,* 350 Pa.Super. 1, 504 A.2d 211 (1986). However, we subsequently reversed the Superior Court's *Hatchard* decision and modified the expansive interpretation of the Shield Law as set forth in *Taylor. Hatchard v. Westinghouse Broadcasting Co.,* 516 Pa. 184, 532 A.2d 346 (1987). We adhere to that modified view today in holding that the privilege provided under the Shield Law was not intended to allow a media defendant to use any of its sources and information *as proof of* verification or evidence of responsibility when it opts to rely upon the privilege.

■ However, the fact that the privilege does not carry with it a concomitant inference either as to the reliability of the information conveyed or the media's responsibility in relying upon it, does not foreclose the media defendant from introducing extrinsic evidence to establish the validity of the information or to demonstrate that they acted responsibly in the dissemination of the information. By undertaking the introduction of such evidence, the media defendant is not required to abandon its Shield Law privilege; nor does it relieve the plaintiff of the burden of proof. This

evidence is simply to be weighed by the fact finder in assessing whether the plaintiff has met the burden of proof.

■ Having determined the legislative intent regarding the privilege and its effect in the instant setting, we now must turn to the question as to whether either federal or state constitutional mandate requires something more in this context.

Under the United States Supreme Court's decision in *New York Times Co. v. Sullivan, supra,* and its progeny, a public official may not recover damages for a defamatory falsehood relating to his official conduct "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–280, 84 S.Ct. at 726; *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *see Monitor Patriot Co. v. Roy,* 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) (rule applies to publication concerning candidate for public office); *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (rule applies to criminal prosecution for defamation of a public official). In the *New York Times* decision the Court also placed the burden of proving both the falsity and the "actual malice" of the allegedly defamatory statements upon the public official-plaintiff. The Court specified that such a plaintiff could not rely on former common law presumptions to satisfy those burdens. 376 U.S. 279, 283–284, 84 S.Ct. at 727–728.[4] This mandate requires the public official-plaintiff to carry both the burdens of production and persuasion.[5] Since we interpret the *Times* mandate as prohibiting the shifting of either of these

4. In *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Court held that the common law presumption of falsity violates the First Amendment even where a newspaper is sued for libel by a private figure.

5. We will discuss *infra* the propriety of the trial court's adverse inference charge in this context.

burdens to a media defendant,[6] we can discern no implied federal constitutional mandate that would require the creation of inferences in favor of the media defendant, particularly where such a construction would require straining the clear meaning of the statutory language and would necessitate the creation of inferences which lack rational foundation.

The difficulty of a public official-plaintiff in establishing malice in an action against a media defendant is evidenced in the United States Supreme Court's decision in *St. Amant v. Thompson, supra.* In *St. Amant* the Court emphasized that the burden requires more than a consideration of whether a reasonably prudent man would have published the article without further investigation, but rather requires the presentation of "sufficient evidence to permit the conclusion that the defendant in fact *entertained serious doubts* as to the truth of his publication." 390 U.S. at 731, 88 S.Ct. at 1325. Recognizing the license given to the media under this standard, the Court justified its position as follows:

> Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not.

*Id.* at 732, 88 S.Ct. at 1326.

It is clear that the Supreme Court has set forth the parameters necessary to satisfy the dictates of the First Amendment. Any further action on our part could run

---

6. The common law presumptions which were barred in these cases were devices which were designed to shift both or either of the burdens from the plaintiff. Thus, the direction that they not be employed implicitly mandates that the burden must remain throughout upon the public official-plaintiff in a defamation action against a media defendant.

afoul of our state constitution.  Under Article I, section 1 of the Constitution of this Commonwealth, a person's interest in his or her reputation has been placed in the same category with life, liberty and property.  *Hatchard v. Westinghouse Broadcasting Co., supra; Meas v. Johnson,* 185 Pa. 12, 19, 39 A. 562, 563 (1898).  Additionally, Article I, section 11 declares that: "[E]very man for an injury done him in his lands, goods, person *or reputation* shall have remedy by due course of law...."  (Emphasis added.)  The redress provided under our body of substantive law is an action in tort for defamation.  To gratuitously embellish upon the stringent requirements of current federal constitutional law, by means of an overly broad interpretation of a state statute, would be in conflict with the recognition given by our state's constitution to a citizen's right to protect his or her reputation.  Moreover, to create fictional inferences to aid a party who does not bear the burden of proof would impermissibly undercut the state constitutional interest in providing redress for defamation.  The Shield Law was designed to protect the free flow of information between the media and its sources.  This objective must be distinguished from a license to the media to use information recklessly and/or maliciously to destroy the reputation of a citizen.

We therefore conclude that the legislative intention was not to confer the broad interpretation to the Shield Law suggested by the Superior Court, that it is not required by the federal constitution, and that it would be repugnant to our own constitution.

■ Having concluded that the General Assembly by its passage of 42 Pa.C.S. § 5942(a), the Shield Law, intended to confer upon the news media an absolute privilege against the disclosure of their sources, we now turn to the trial rulings that are the subject of this appeal.  We need only address the objections raised relating to the testimony of Kent Pollock for the disposition of this appeal.  Witness Pollock was offered to show that the defamatory statements in the articles he participated in were not recklessly

made without regard to the truth of the assertions contained therein. After testifying as to his experience as a reporter up to the time of the publishing of the articles in question, he was permitted, over objection by plaintiff's counsel,[7] to describe the ongoing investigation from which the defamatory statements against the plaintiff arose. Pollock then proceeded to articulate various pieces of information he had received from unidentified sources which formed the basis for the statements made in the challenged articles. The trial court ultimately ruled that, if the defendant failed to disclose the sources of this information, it would be precluded from defending on the grounds of any information supplied by these unidentified sources. We note that the trial court in a very difficult and complex area attempted to adjust competing interests in a fair and judicious manner. The difficulty arose from the prevailing uncertainty as to the proper application of our Shield Law in the context of present defamation law.[8] Nevertheless,

7. The objections were made to the hearsay evidence that was permitted in describing the investigation. The trial court overruled these objections on the grounds that this evidence was not to be used for the proof of the facts asserted but rather as evidence of the state of mind of the reporter at that time. See Reproduced Record Vol. V, pgs. 2862(a)–2865(a).

8. Subsection (a) of the current Shield Law, 42 Pa.C.S. § 5942(a), is substantially a reenactment of section 1 of the Act of June 25, 1937, P.L. 2123, 28 P.S. § 330 (repealed). When the original statute was enacted in 1937, the law of defamation was such that the plaintiff had the benefit of several evidentiary and procedural advantages. For example, a defamatory statement was presumed to be false. *E.g., Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971) (recognizing proposition as long standing rule); *Hartranft v. Hesser*, 34 Pa. 117 (1859). If the defendant wished to defend on the ground that the defamatory communication was true, he had the burden of proving it. *Montgomery v. Dennison*, 363 Pa. 255, 69 A.2d 520 (1949); *Mulderig v. Wilkes–Barre Times*, 215 Pa. 470, 64 A. 636 (1906); *Bryant v. Pittsburg Times*, 192 Pa. 585, 44 A. 251 (1899); *Chapman v. Calder*, 14 Pa. 365 (1850). Moreover, unless the statement came within some legal privilege, it was presumed to have been made with malice. *Corabi, supra; Neeb v. Hope*, 111 Pa. 145, 2 A. 568 (1886); *Barr v. Moore*, 87 Pa. 385 (1878). For a defendant to have the protection of a privilege, such as the one that existed for statements about matters of public concern, he had to first establish, *inter alia,* that the statement was made with a reasonable belief in its probable truth, *E.g., Morgan v. Bulletin Co.*, 369 Pa. 349, 85 A.2d 869 (1952); *O'Donnell v. Philadel-*

we are constrained to agree with the Superior Court that the ruling was erroneous and that the error requires the grant of a new trial.

While the reporter's information is properly admitted and no adverse inference may be drawn from the invocation of the Shield Law, the trial court must also instruct the jury that the invocation of the Shield Law does not establish an affirmative inference either as to the reliability of the source or as to the validity of the information received. The plaintiff is free to introduce rebuttal evidence and/or argue that the record does not disclose any evidence to support the reliability of the information received or the credibility of the source that supplied that information.

■ Because the burden of proof remains upon the plaintiff throughout the trial, the defendant may choose not to offer evidence and may still prevail if the jury concludes that plaintiff has failed to meet the burden. If a defendant chooses to dispute the plaintiff's evidence, then that evidence in response must be critically evaluated. This is not a shifting of the burden; rather it is evidence that must be evaluated by the fact finder in determining whether the burden of proof has been met by plaintiff. The trial court's responsibility in its charge is to assist the fact finder in understanding its role in evaluating the evidence presented. *E.g., Smith v. Clark,* 411 Pa. 142, 190 A.2d 441 (1963). In discharging this responsibility, the trial court in its instructions should make clear for the jury, (a) that the burden of proof remains upon the plaintiff throughout the trial; (b)

*phia Record Co.* 356 Pa. 307, 51 A.2d 775 (1947); *Hartman v. Hyman & Lieberman,* 287 Pa. 78, 134 A. 486 (1926); *Neeb v. Hope, supra.* It was only after the defendant had proved the elements of privilege that it became the plaintiff's burden to prove *actual malice. Morgan v. Bulletin Co., supra.*

Given the state of defamation law when the 1937 Shield Law was enacted, the conclusion must be drawn that there was no contemplation on the part of the legislature that the statute would present any obstacle to a person seeking redress for injury to his reputation. It was only with the advent of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its decisional offspring, that Pennsylvania's Shield Law presented a problem for plaintiffs suing media defendants for defamation.

that, if the Shield Law is invoked by the defendant to avoid disclosing a source, *no inference either favorable or adverse may be drawn from the act of invoking that privilege as to the reliability of the unidentified source or as to the accuracy of the information supplied;* and, (c) that the jury is to consider any evidence and/or arguments made by plaintiff and defendant as to the reliability of the undisclosed source and as to the accuracy of the information supplied.[9]

Accordingly, for the reasons stated herein, the order of the Superior Court is affirmed.

LARSEN, McDERMOTT and STOUT, JJ., did not participate in the consideration or decision of this case.

9. When this Court decides that a new trial must be granted for reason of a particular error, we do not, as a rule, address other issues that have been presented. However, because the instant matter is a complex one and must be retried, we consider it appropriate to resolve another question which is likely to arise again, namely, the trial court's "adverse inference" charge relating to reporter Greg Walter. In our view, the issue of whether Walter was medically incapable of being a witness for PNI was one that the trial court itself should have determined, not the jury. *Farley v. Southeastern Pennsylvania Transportation Authority,* 279 Pa.Super. 570, 421 A.2d 346 (1980). Clearly, if the question were one of a witness' mental competency to testify, the determination would be one for the trial court to make. *E.g., Commonwealth v. Goldblum,* 498 Pa. 455, 447 A.2d 234 (1982). We see no reason to apply a different rule where the issue relates to a person's physical capacity to testify as a witness. In sum, we agree with the Superior Court's conclusion that the trial judge in the instant case erred in ruling that it was a jury question.