James B. NORTON, III, Alan M. Wolfe
and James J. Marlowe

v.

William T. GLENN, Sr., Troy Publishing Company, Inc., Tom Kennedy
and William M. Caufield

Appeal of: Alan M. Wolfe.

James B. Norton, III, Alan M. Wolfe,
and James J. Marlowe

v.

William T. Glenn, Sr., Troy Publishing
Company, Inc., Tom Kennedy and
William M. Caufield

Appeal of: James B. Norton, III.

Superior Court of Pennsylvania.

Argued Dec. 11, 2001.
Filed March 18, 2002.
Reargument Denied May 20, 2002.

William T. Wilson, West Chester, for Wolfe.

Geoffrey R. Johnson, Philadelphia, for Norton.

Michael E. Baughman, Philadelphia, for Troy Publishing.

Before JOYCE, OLSZEWSKI and MONTEMURO *, JJ.

JOYCE, J.

¶ 1 James B. Norton III and Alan M. Wolfe (Appellants) appeal from the judgment entered on a jury verdict in favor of Troy Publishing Company, Tom Kennedy, and William Caufield (Appellees).[2] For the reasons more fully set forth below, we vacate the judgment, reverse the order denying Appellant's motions for a new trial, and remand the matter for a new trial.

* Retired Justice assigned to Superior Court.

¶ 2 The relevant facts and procedural history of the case were clearly and cogently set forth in the trial court opinion. The genesis of this lawsuit is an article that appeared in the newspaper the Chester County Daily Local on April 20, 1995. The article, headlined "Slurs, insults drag town into controversy" involved the fallout from a special meeting of the Parkesburg Borough Council which had been held the previous evening. On that date, council president, plaintiff James Norton, sought to "end the fighting and name calling" which had been occurring at council meetings. The article published comments made by defendant Glenn, then also a member of council, about Norton, Parkesburg Mayor Alan M. Wolfe, and Borough Solicitor James J. Marlowe. In the article, defendant Glenn characterized Wolfe and Norton as "queers" and "child molesters" and quoted him as calling plaintiff Marlowe a "shyster Jew." The article was written by defendant Tom Kennedy, then an employee of the Daily Local, which is owned by defendant William Caufield and published by defendant Troy Publishing. Plaintiffs subsequently filed suit for defamation and false light invasion of privacy.

Prior to trial, all defendants filed motions for summary judgment. By order dated August 2, 1999, the Honorable Paula Francisco Ott granted defendant Glenn's motion for summary judgment as to plaintiff Marlowe, and denied the motion as to plaintiffs Norton and Wolfe. Judge Ott also denied the motion for

2. The jury returned a verdict against defendant William T. Glenn, Sr. The term "Appellees," as used in this opinion refers only to Troy Publishing Company, Tom Kennedy, and William Caufield.

summary judgment filed by Troy Publishing Company, Tom Kennedy and William Caufield, but ordered that the jury at the trial of this matter "be instructed on the fair report privilege."[3] Trial began before a jury on March 27, 2000. On March 31, 2000, the jury returned a verdict in favor of plaintiff Norton and against defendant Glenn and awarded $10,000 compensatory and $7,500 punitive damages. The jury returned the identical verdict as to plaintiff Wolfe. Defendants Troy Publishing Company, Tom Kennedy and William Caufield (the media defendants) were found not liable to plaintiffs.

Trial Court Opinion, 01/19/2001, at 1–3 (footnote added).

¶ 3 Appellants timely filed post-trial motions requesting a new trial as to Appellees. The trial court denied Appellants' post-trial motions. Appellant, Norton filed a praecipe to enter judgment on the verdict, and said judgment was entered February 12, 2001. Appellant Wolfe filed a praecipe to enter judgment on the verdict, and said judgment was entered February 5, 2001. Appellants timely appealed.

■ ¶ 4 The standard of review applied when evaluating the grant or refusal of a new trial is settled. We may reverse the decision of the trial court if it abused its discretion or committed an error of law that controlled the outcome of the case. *Haddad v. Gopal*, 787 A.2d 975 (Pa.Super.2001).

· ■ ¶ 5 The question of paramount importance in this matter, and the thrust of Appellants' appeal, focuses on whether the Commonwealth of Pennsylvania should adopt the neutral reportage privilege that was applied by the trial court.[4] As with any question of law, this Court's scope of review is plenary. *See id.* With this issue in mind, we will begin our discussion.

¶ 6 While the neutral reportage privilege that was applied by the trial court has Constitutional ramifications, it is not found anywhere in the United States Constitution or in any amendments thereto. The privilege does not appear in the Pennsylvania Constitution or in any Pennsylvania statutory law. Instead, the neutral reportage privilege was first recognized in *Edwards v. National Audubon Society*, 556 F.2d 113, 120 (2nd Cir.1977). In *Edwards*, the United States Court of Appeals for the Second Circuit stated:

> when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity. *See Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Medina v. Time, Inc.*, 439 F.2d 1129 (1st Cir.1971). What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First

---

**3.** We note that Judge Ott, in her August 2, 1999 opinion denying Appellees' motion for summary judgment, found the "Fair Report Privilege" and the "Neutral Reportage Privilege" to be the same. Trial Court Opinion, 08/02/1999 at 2, n. 1. Therefore, at trial, the jury was instructed that the neutral reportage privilege applied, and evidence was excluded based on neutral reportage.

**4.** None of the parties argue that the neutral reportage privilege is currently recognized in Pennsylvania. The only Pennsylvania Supreme Court or Superior Court case that discusses the privilege is *DiSalle v. P.G. Publishing Co.*, 375 Pa.Super. 510, 544 A.2d 1345, (1988), *allowance of appeal denied*, 521 Pa. 620, 557 A.2d 724 (1989), *cert. denied* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989), and the discussion is not law but obiter dictum.

Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation.

*Edwards, supra* at 120.

¶ 7 Simply put, we find that *Edwards* misconstrues *Time, Inc. v. Pape, supra*.[5] *Time, Inc. v. Pape* was a suit for libel based on Time Magazine's republication of part of the 1961 United States Commission on Civil Rights Report (the Report). The Report republished allegations made by a Mr. James Monroe where he claimed he was brutalized at the hands of the Chicago Police Department in a civil complaint filed in federal court. Frank Pape, the Deputy Chief of Detectives of the Chicago Police Department, sued Time Magazine since the republication did not say that the allegations were from a civil complaint, and it created the appearance that Mr. Monroe's allegations were factual findings by the United States Commission on Civil Rights. The issue decided by the United States Supreme Court was whether Time's omission of the word "alleged" showed actual malice. The Supreme Court determined that Time's failure did not rise to the level of actual malice. This case did not alter the rule announced in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[6]

¶ 8 *Time, Inc. v. Pape* did not carve out a privilege allowing "prominent" organizations expanded rights, it did not alter the law of defamation depending on who is speaking, and it did not espouse a rule that disregarded the private views of the reporter regarding the validity of what is reported.

¶ 9 *Dickey v. CBS Inc.*, 583 F.2d 1221 (3rd Cir.1978), while not binding, is persuasive with respect to the fact that *Edwards* was an overly expansive interpretation of *Time, Inc. v. Pape*. In *Dickey v. CBS Inc.*, the United States Court of Appeals for the Third Circuit squarely rejected the neutral reportage privilege and the expansive interpretation that the *Edwards* court imputed to *Time, Inc. v. Pape*. *Dickey, supra* at 1225, 1226. *Time, Inc. v. Pape* did not alter the long-standing rule enunciated in *New York Times v. Sullivan, supra*.

¶ 10 Despite the history of the neutral reportage privilege, there are jurisdictions that apply some form of the privilege. These jurisdictions include: the Eighth Circuit, *Price v. Viking Penguin, Inc.* (8th Cir.1989) 881 F.2d 1426, *cert. denied*, 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990); the United States District Court for the Southern District of New York, *Coliniatis v. Dimas*, 965 F.Supp. 511, 520 (S.D.N.Y.1997); and the United States District Court for the Northern District of California, *Barry v. Time*, 584 F.Supp. 1110, 1127 (N.D.Cal.1984).[7]

**5.** It should be pointed out that no court is bound by the neutral reportage privilege enunciated in *Edwards*, because the privilege itself was obiter dictum. *See DiSalle v. P.G. Publishing Co.*, 544 A.2d at 1354–1355.

**6.** "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of

whether it was false or not." *New York Times v. Sullivan, supra*, at 280, 84 S.Ct. 710, 11 L.Ed.2d 686.

**7.** Appellees cite an unreported Ohio case, *J.V. Peters & Co. v. Knight Ridder Co.* (Mar. 21, 1984), Summit App. No. 11335, 1984 WL 4803, to illustrate that other jurisdictions have adopted the privilege. While some intermediate appellate courts in Ohio may recognize the privilege, we found that the Ohio Supreme has explicitly declined to recognize the neutral reportage privilege. *Young v. The*

¶ 11 However, as we stated above, this privilege does not appear in the United States Constitution, the Pennsylvania Constitution, or in any Pennsylvania statutory law. Our research has uncovered no Pennsylvania case adopting the neutral reportage privilege. As stated above, *DiSalle* is the only reported Pennsylvania case that mentions neutral reportage but only as dicta. *See DiSalle, supra.* Furthermore, none of the decisions in any of the jurisdictions that have adopted the privilege are binding on this Court. Therefore, the ultimate question is whether or not Pennsylvania adopts the neutral reportage privilege? We answer this question in the negative.

¶ 12 We find the neutral reportage privilege was borne out of a misconstruction of *Time, Inc. v. Pape,* and we are not persuaded to adopt this privilege in the Commonwealth of Pennsylvania. Since the trial court found that this privilege applied, based evidentiary rulings on this premise, and instructed the jury as such, it committed an error of law that controlled the outcome of the case.[8]

¶ 13 Judgment vacated. Order denying Appellant's motion for a new trial reversed. Case remanded for a new trial consistent with this opinion. Jurisdiction relinquished.

¶ 14 MONTEMURO, J., files Concurring Opinion.

## CONCURRING OPINION BY MONTEMURO, J.:

¶ 1 I join the Majority's conclusions that no neutral report privilege exists as such in Pennsylvania and that this case must be returned for retrial. I write separately, however, to note the analytical framework for proving abuse of the fair report privilege, which is and has remained unarguably viable for some time. *See Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963); *DeMary v. Latrobe Printing and Publishing Company et al.,* 762 A.2d 758 (Pa.Super.2000), *appeal denied,* 786 A.2d 988 (Pa. 2001).

¶ 2 As the Majority accurately points out, the trial court regarded the two privileges as synonymous, their differences as semantic rather than substantive. Indeed, following the *dicta* of *DiSalle v. P.G. Publishing Co.,* 375 Pa.Super. 510, 544 A.2d 1345 (1988), *appeal denied,* 521 Pa. 620, 557 A.2d 724 (1989), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989), the trial court regarded the neutral report privilege as an extension of the fair report privilege when applied to a particular set of facts. As the Majority observes, the trial court thus, erroneously, "found that [the neutral] privilege applied, based evidentiary rulings on this premise, and instructed the jury as such." (Majority Op. at 298).

¶ 3 In *DeMary, supra,* an *en banc* panel of this Court recently reiterated the definition of the fair report privilege, which in Pennsylvania "protects the press from liability for the publication of defamatory material if the published material reports on an official action or proceeding." *Id.* at 762. The privilege may be forfeited by a publisher who exaggerates or embellishes its account of the occasion, *id.,* which must be "fair, accurate and complete." *Sciandra, supra* at 589. Publication of defama-

*Morning Journal,* 76 Ohio St.3d 627, 629, 669 N.E.2d 1136, 1138 (1996).

8. The trial court admits as much in its opinion: "[h]owever, should an appellate court determine that the neutral reportage privilege does not apply to this case, [Appellants] would be entitled to a new trial due to [the trial court's] exclusion of their evidence of actual malice." Trial Court Opinion, 01/19/2001, at 8–9.

tory material solely for the purpose of causing harm to the person defamed results in loss of the fair report privilege. *DeMary, supra* at 762. Whether a privileged occasion occurred is a matter for the defendant to establish and for the trial court to decide, *Oweida v. Tribune–Review Publishing Company,* 410 Pa.Super. 112, 599 A.2d 230, 235 (1991), but whether abuse of the privilege has occurred is a question for the jury. *DeMary, supra* at 763.

¶ 4 The *DeMary* Court held, albeit in the context of preliminary objections, that the burden of proof borne by a public figure in order to succeed in making out a defamation case against (a) media defendant(s) requires two types of malice to be demonstrated. "First, in order to make a prima facie case the plaintiff must show that the newspaper acted with actual malice toward the truthfulness of the statement." *Id.* at 765. The actual malice referred to is that which was defined by the Supreme Court of the United States in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as knowledge of the falsity of the defamatory statements or reckless disregard for their truth or falsity. *DeMary, supra* at 764. "Second, to defeat the fair report privilege once it has been properly raised, the plaintiff must show that the defendant was motivated by ill will toward the plaintiff," *id.* at 765, that is, by common law malice. As the *DeMary* Court explains, "Actual malice focuses on the defendant's attitude toward the truth, whereas common law malice focuses on the defendant's attitude towards the plaintiff." *Id.* at 764.

¶ 5 Here, the major problem is one of nomenclature: although the neutral report privilege does not exist, the fair report privilege does. The trial court conflated the two in ruling on evidentiary questions and in instructing the jury. The question then becomes whether the court's actions, if analyzed according to the law pertaining to the fair report privilege, are still in error. Put another way, if the trial court's rulings and instructions comply with the requirements of the fair report privilege, is the (theoretical) correctness of its decisions compromised by the court's having referred, erroneously, to the controlling principle as the neutral report privilege? I believe this question must be answered in the affirmative, since, despite the trial court's view of the two privileges as interchangeable, they are not. Accordingly, I agree with the Majority that the decision must be reversed, and this case retried.