860 A.2d 48

**James B. NORTON, III, Alan M. Wolfe, and James Marlowe,**

v.

**William T. GLENN, Sr., Troy Publishing Company, Inc., Tom Kennedy, And William Caufield,**

**Appeal of Troy Publishing Company, Inc., Tom Kennedy, and William M. Caufield.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 2003.

Decided Oct. 20, 2004.

214

Michael E. Baughman, Robert C. Heim, Amy B. Ginensky, Philadelphia, Gerald A. Hughes, Trenton, NJ, for Troy Pub. Co., Inc., appellant.

Terence Jon Barna, Corinna R. Wilson, Niles Benn, York, Walter Thomas McGough, Katherine L. Hatton, Philadelphia, for PA Newspaper Ass'n, et al., appellant amici curiae.

Jennifer DuFault James, Carl Anthony Solano, Bruce Philip Merestein, Alison Finnegan, Philadelphia, for Committee of Seventy, appellant amicus curiae.

William T. Wilson, West Chester, Dennis B. Young, Parkesburg, Laurie Wyche-Abele, West Chester, for Alan M. Wolfe, appellee.

Richard A. Sprague, Geoffrey Richard Johnson, Philadelphia, for James B. Norton, III, appellee.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Chief Justice CAPPY.

At issue in these matters is whether the neutral reportage privilege is encompassed within the Pennsylvania or United States Constitutions. For the reasons that follow, we hold that it is not. We therefore affirm the order of the Superior Court.

These matters arise out of an article ("Article") written by Tom Kennedy ("Kennedy") which appeared in the April 20, 1995 edition of the *Chester County Daily Local ("Daily Local")*. The Article, which was entitled "Slurs, insults drag town into controversy," detailed heated exchanges that occurred among members of the Parkersburg Borough Council ("Council"); the Article reported that these exchanges occurred both inside and outside of the Council chamber. At issue are extra-Council chamber comments made by William T. Glenn, Sr. ("Glenn"), a member of the Council, regarding Council President James B. Norton III ("Norton") and Borough Mayor Alan M. Wolfe ("Wolfe").[1]

The Article stated that Glenn had claimed that Norton and Wolfe were homosexuals and that Glenn had observed Norton involved in a homosexual act in Norton's house. The Article also reported that Glenn had issued a written statement strongly implying that Glenn considered Norton and Wolfe to be "queers and child molesters." The Article related that Glenn had declared that he had a duty to make the public aware of this information as Norton and Wolfe had "access to children. . . ." Finally, according to the Article, Glenn asserted that Norton had made homosexual advances toward Glenn

---

1. The Article also reported on Glenn's comments regarding James J. Marlowe II ("Marlowe"), the Borough solicitor. We need not detail these comments as Marlowe is not before this court and the statements regarding him are of no moment in resolving this appeal.

which escalated to Norton grabbing Glenn's penis, apparently without Glenn's consent.

The Article noted that when informed of Glenn's claims, Norton responded, "If Mr. Glenn has made comments as bizarre as that, then I feel very sad for him, and I hope he can get the help he needs."

Wolfe, Norton (collectively, "Appellees") and Marlowe filed separate actions, each raising defamation claims.[2] They named as defendants Kennedy, the *Daily Local,* William Caufield, who owned the *Daily Local,* and the Troy Publishing Company, Inc., which published the *Daily Local;* these defendants shall collectively be referred to as the "Media Defendants". Appellees and Marlowe also filed suit against Glenn. Ultimately, these actions were consolidated before the trial court.

The Media Defendants and Glenn filed motions for summary judgment. In an opinion granting relief in part and denying relief in part, the trial court determined that the Media Defendants were entitled to the protection of a privilege known as the neutral reportage privilege. Tr. ct. slip op., 8/02/1999, at 12. The trial court reasoned that this privilege was nothing more than the long-recognized fair report privilege, *id.* at 2 n. 2, a privilege which grants immunity from defamation suits to media entities which accurately report the official proceedings of government. The trial court opined that pursuant to this privilege, "the subjective awareness of the publisher, of the truth or falsity of the statement, is irrelevant." *Id.* at 12. The trial court explicitly stated that its "holding eliminates the necessity of a determination of actual malice [3] as to the Media Defendants." *Id.*

2. Appellees and Marlowe also raised false light invasion of privacy claims. The false light claims were dismissed by the trial court prior to the matters being submitted to the jury. No appeal was taken regarding the false light invasion of privacy claims.

3. "Actual malice" is a term of art in defamation actions. As detailed more fully below, the United States Supreme Court has determined that where the plaintiff in a defamation action is a public figure or public official, that plaintiff must prove, *inter alia,* that the defendant published the statement with actual malice. *Milkovich v. Lorain Journal Co.,*

At the commencement of trial, the trial court dismissed Marlowe's action. Appellees' claims against the Media Defendants and Glenn proceeded to trial. Pursuant to its earlier rulings that evidence of actual malice is irrelevant in a neutral reportage matter, the trial court precluded Appellees from introducing evidence regarding whether the Media Defendants acted with actual malice.

Via special interrogatories, the jury found that Glenn had made the statements attributed to him in the Article and had made them with actual malice; accordingly, it held him liable for defamation. As against Glenn, it awarded Norton $10,000.00 in compensatory damages and $7,500.00 in punitive damages; it granted an identical award to Wolfe. Glenn did not appeal.

Pursuant to another set of special interrogatories, the jury determined that the Media Defendants were not liable. Specifically, the jury found that the Article accurately conveyed the gist of the statements Glenn made and did not imply that the Media Defendants adopted or concurred in those statements. Thus, pursuant to the trial court's instruction regarding the neutral reportage privilege, the jury found the Media Defendants not liable in defamation.

Appellees filed post-trial motions, requesting that a new trial be granted. The trial court denied relief. In its opinion explaining its determination, the trial court articulated its definition of the neutral reportage privilege. It interpreted the doctrine as conferring a privilege on the publication of "serious charges of a public official involved in an ongoing controversy and concerning other public officials [4] irrespective of the publisher's belief as to the falsity of the charges, provided that the report does not espouse or concur in the charges and in good faith believe that the report accurately

497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Actual malice is established where the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 14, 110 S.Ct. 2695 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

4. The trial court found that Norton and Wolfe were public officials. N.T., 3/30/2000, at 649–50. This determination has not been contested.

conveys the charges made." Tr. ct. slip op. dated 1/19/2001 at 3–4. The trial court also justified precluding Appellees from introducing evidence regarding whether the Media Defendants acted with actual malice in publishing the Article. It reasoned that "the neutral reportage privilege does offer broader protection than the actual malice standard, and under the neutral reportage privilege the evidence offered was irrelevant." *Id.* at 8. The trial court noted that in the event that an appellate court determined that the neutral reportage privilege was not viable, then Appellees "would be entitled to a new trial due to [the trial court's] exclusion of their evidence on the issue of actual malice." *Id.* at 8–9.

On appeal, the Superior Court reversed. *Norton v. Glenn,* 797 A.2d 294 (Pa.Super.Ct.2002). The Superior Court found that there was no constitutional or statutory basis for the neutral reportage privilege. Thus, it concluded that the trial court had committed an error of law when it determined that such a privilege applied to this case and that a new trial must be awarded.

■ The Media Defendants filed a petition for allowance of appeal with this court. We granted allocatur, limited to the issue of whether there is a federal[5] or state constitutional basis for declaring that the media enjoy the protections of a doctrine known as the neutral reportage privilege. As this is a question of law, our standard of review is *de novo* and our scope of review is plenary. *See In re Hickson,* 573 Pa. 127, 821 A.2d 1238 (2003).

The Media Defendants urge us to find that the First Amendment encompasses the neutral reportage doctrine. They contend that we should follow the lead of several other jurisdictions and adopt this privilege. *See, e.g., Sunshine*

5. We note that at oral argument before this court, an attorney for one of the Appellees contended that the Media Defendants did not raise the First Amendment issue until they were before this court, and thus the issue was waived. This assertion is erroneous. The Media Defendants have asserted that the neutral reportage privilege has a basis in the First Amendment ever since the earliest stages of this litigation. *See* Media Defendant's Motion for Summary Judgment, filed 3/15/1999, at 11–12.

*Sportswear & Electronics, Inc. v. WSOC Television, Inc.,* 738 F.Supp. 1499 (D.S.C.1989); *In re United Press International,* 106 B.R. 323 (D.D.C.1989); *Barry v. Time, Inc.,* 584 F.Supp. 1110 (N.D.Cal.1984) (finding that the First Amendment mandates adoption of the neutral reportage doctrine). Appellees, on the other hand, wish us to follow the lead of those jurisdictions which have rejected the privilege. *See, e.g., Postill v. Booth Newspapers, Inc.,* 118 Mich.App. 608, 325 N.W.2d 511 (1982); *McCall v. Courier–Journal,* 623 S.W.2d 882 (Ky.1981).

We must now determine whether the neutral reportage privilege is grounded in the First Amendment. In analyzing this claim, we find that the logical first step is to discuss at length the decision which first defined the contours of the privilege and declared it to be mandated by the First Amendment. *See Edwards v. National Audubon Socy., Inc.,* 556 F.2d 113 (2d. Cir.1977). At issue in *Edwards* was an article published by the *New York Times* ("the *Times*"). This article stated that the National Audubon Society declared that certain scientists who claimed that bird populations were actually increasing in spite of the use of the insecticide DDT were paid "liars". Several of the scientists who were named filed suit against, *inter alia,* the *Times* seeking damages in defamation. The jury returned a verdict against the *Times.*

██ The circuit court reversed on appeal. The court declared that the First Amendment demands the protection of "a robust and unintimidated press...." *Id.* at 120. It hypothesized that "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them." *Id.* Accordingly, it designed a privilege that gave sweeping protection to the media to repeat such newsworthy statements, and determined that this new privilege had its genesis in the federal Constitution. It reasoned that "when a responsible, prominent organization ... makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private view regarding their validity." *Id.* In the view of the *Edwards*

court, "the press may [not] be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth." *Id.* The court therefore crafted the neutral reportage doctrine,[6] which immunizes media defendants from liability for defamation even where the media have "serious doubts regarding the[ ] truth" of the statements they publish. *Id.*[7] Essentially, this privilege adopts the radical notion that media defendants, in repeating newsworthy comments regarding a public official, will be relieved from liability even where the public official-plaintiff can establish that the media defendants acted with actual malice.

In adopting the neutral reportage doctrine, the *Edwards* court relied heavily on the U.S. Supreme Court's decision in *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), implying that *Time* announced that the First Amendment mandated the adoption of this privilege. Were this reading of *Time* correct, it would make our task a simple one

6. As noted *supra*, the trial court concluded that the neutral reportage privilege is merely another name for the fair report privilege. Tr. ct. slip op., 8/02/1999, at 2 n. 2. It posited that since the fair report privilege has long-since been recognized in this jurisdiction, *see Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963) (adopting the fair report privilege), then there was no need to adopt the neutral reportage privilege.

This conclusion was incorrect. As noted by Judge (former Justice) Montemuro in his concurring opinion in the court below, the neutral reportage privilege is an animal distinct from the fair report doctrine. *Norton,* 797 A.2d at 298–99 (Montemuro, J., concurring). The fair report doctrine adopted by *Sciandra* is a common-law privilege protecting media entities which publish fair and accurate reports of governmental proceedings. At issue here, however, is whether there is a constitutional privilege to publish accounts of statements that were not made in the course of official proceedings.

7. We note that some courts have found that *Edwards'* pronouncement on the neutral reportage privilege was *obiter dictum* and thus is not binding precedent. *See, e.g., DiSalle v. P.G. Pub. Co.,* 375 Pa.Super. 510, 544 A.2d 1345, 1355 (1988). We need not resolve this dilemma because regardless of whether *Edwards'* discussion of the neutral reportage privilege is a holding or mere *obiter dictum,* it would not be binding on this court. *Commonwealth v. Ragan,* 560 Pa. 106, 743 A.2d 390, 396 (1999) ("[I]n interpreting federal case law, this Court is not bound by decisions of federal courts inferior to the United States Supreme Court, even though we may look to them for guidance.")

of merely applying the high Court's holding to the matters *sub judice*.

The *Edwards* court's reliance on *Time*, however, was ill-placed. In *Time*, the media defendant repeated statements regarding a public official that had been made in a civil rights report. The Court did not absolve the media defendant of liability on the basis that the defendant acted merely as a neutral conduit for statements of a third party; rather, the Court found that the defendant escaped liability because the public official-plaintiff could not establish that the defendant had acted with actual malice. Thus, *Time* did not explicitly or even impliedly adopt a privilege whereby the press could with impunity republish statements made by public figures or officials, escaping liability even where it could be shown that the press published these statements with actual malice. Indeed, *Time* applied the actual malice standard to the matter before it.

Furthermore, in the years following *Edwards*, the U.S. Supreme Court has not adopted the neutral reportage doctrine, or in any fashion declared that a defendant (be it a media defendant or simply a private citizen-defendant) will be immune from suit even where the defendant publishes with actual malice. *See Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 660 n. 1, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (declining to address the neutral reportage doctrine as the issue had not been presented to the Court).[8] Thus, as the U.S. Supreme Court has not squarely addressed the validity of the neutral reportage privilege, our next task is to determine whether this privilege is a logical extension of

8. In our opinion, the closest the high Court has come to opining on whether a media defendant enjoys immunity from suit where it acts as a mere conduit for statements of third parties occurred in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). In passing, the *Pittsburgh Press* Court noted that a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own." *Id.* at 386, 93 S.Ct. 2553. Were this statement a holding, we could conclude that the high Court would reject the neutral reportage privilege. This statement, however, was mere *obiter dictum*; thus, we cannot utilize *Pittsburgh Press* to answer the question with which we are presented.

decisions issued by the high Court. To answer this question, we must thoroughly review the U.S. Supreme Court's decisions regarding the operation of the First Amendment in the context of defamation actions.

Until the early 1960s, the high Court had consistently declared that imposition of civil liability for defamatory publications did not impinge on the First Amendment's guarantee of free expression. *See, e.g., Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952). Thus, the First Amendment did not constrict the states' power to fashion causes of action for defamation.

The law changed radically when the high Court announced its decision in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and declared that the First Amendment does protect certain defamatory speech. In that matter, the *Times* had published an advertisement detailing acts of violence against Dr. Martin Luther King, Jr. as well as several other egregious civil rights violations. L.B. Sullivan ("Sullivan"), who was at the time of the advertisement's publication a Commissioner of the City of Montgomery, Alabama, filed a defamation action. Sullivan asserted that the advertisement had linked him with these nefarious activities, and accordingly he was entitled to damages in defamation. In instructing the jury, the trial court judge stated that falsity and malice were to be presumed. The jury returned a verdict in favor of Sullivan.

Ultimately, the U.S. Supreme Court granted *certiorari* in the matter. In commencing its analysis, the Court emphasized that there is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government or public officials." *Id.* at 270, 84 S.Ct. 710. The Court concluded that in order to stay true to this "profound national commitment," it had to place certain limitations on the states' ability to craft defamation law with regard to actions filed by public official-plaintiffs. No longer could malice and falsity be presumed; in fact, a public figure-plaintiff would not necessar-

ily be entitled to recover even if the published statements were provably false and defamatory. Rather, the Court concluded that where the plaintiff in a defamation action is a public official, the plaintiff will not be allowed to recover unless the defendant published the statement with "actual malice". *Id.* at 279–80, 84 S.Ct. 710.

The *New York Times* Court's actual malice standard announced severe restrictions on a public figure-plaintiff's rights to recover in defamation. The Court stated that actual malice will be found only where the defendant published the account "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. 710. The Court stressed that actual malice will not be made out on a mere showing that the media defendant was negligent in ascertaining the truth of the statement it publishes. *Id.* at 288, 84 S.Ct. 710. Furthermore, the burden of proof was placed not on the defendant, but rather on the public official-plaintiff. *Id.* at 279–80, 84 S.Ct. 710. In applying the new standard to the matter before it, the Court found that the evidence adduced by Sullivan could not meet the actual malice standard, and therefore the *Times* could not be held liable.

Following *New York Times,* the high Court issued a spate of decisions which further illuminated this new actual malice standard. One instructive decision is *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). At issue in that matter was a televised statement made by Phil St. Amant ("St. Amant"), a candidate for public office. In that statement, St. Amant repeated comments made by a third party regarding the shady activities allegedly engaged in by Herman Thompson ("Thompson"), who was the president of the local Teamsters' Union. Thompson sued St. Amant, seeking damages in defamation. The question presented was whether in establishing that St. Amant acted with "reckless disregard", his conduct was to be measured against what a reasonably prudent man would have done. The Court rejected using the objective reasonable man standard in determining whether the publisher made the statement with actual malice. It stated that for purposes of establishing actual malice, reckless disre-

gard is "not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Id.* at 731, 88 S.Ct. 1323. Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *Id.*

The *St. Amant* Court cautioned would-be defendants in such actions, however, by stating that immunity from liability would not be guaranteed merely by a protestation from the defendant that it published in good faith. Rather, the Court found that actual malice could be made out where "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 732, 88 S.Ct. 1323.

Decisions following *New York Times* placed further restrictions on the states' ability to define defamation actions, making it resoundingly clear how cherished is the First Amendment freedom of expression. For example, the high Court determined that the *New York Times* actual malice standard was applicable even in matters where the plaintiff was not a public official. It stated that some people who are not public officials must be considered "public figures" because they are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 14, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (citations omitted). The *Milkovich* Court concluded that in defamation actions filed by "public figures", the First Amendment required that the plaintiff establish actual malice before the plaintiff would be allowed to recover.

Furthermore, while the U.S. Supreme Court rejected application of the actual malice standard to cases involving private figure plaintiffs, it did place limitations on even these actions. It found that the common law presumption of damages in a

defamation action was inconsistent with the First Amendment; for a private citizen-plaintiff to recover, he must show that an actual injury resulted from the defamatory statements. *Gertz v. Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Finally, we must note that in none of these decisions did the high Court determine that because of the media's special role in our society, the common law cause of action for defamation should be abrogated vis-à-vis the media. In fact, in terms of fashioning legal standards in these defamation matters, the Court has not declared that a media defendant is owed even a scintilla more protection than a private citizen-defendant.

Rather, the Court has declared that "[t]he need to avoid self-censorship by the news media is ... not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation." *Gertz,* 418 U.S. at 340, 94 S.Ct. 2997. The Court has repeatedly stated that the claim that the Federal Constitution requires such a blanket immunity for the media constitutes an "an untenable construction of the First Amendment." *Herbert v. Lando,* 441 U.S. 153, 176, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

Instead, the Court has cautioned that in the area of the law where defamation actions and free expression rights intersect, the courts cannot focus myopically on the preservation of free expression. While it recognized that the First Amendment's "guarantee of free and uninhibited discussion of public issues" is critical to the functioning of our democracy, it has sagely opined that "there is also another side to the equation; we have regularly acknowledged the important social values which underlie the law of defamation, and recognized that society has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Milkovich,* 497 U.S. at 22, 110 S.Ct. 2695 (citing *Rosenblatt v. Baer,* 383 U.S. 75, 86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); internal quotation marks omitted). "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects

no more than our basic concept of the essential dignity and worth of every human being-a concept at the root of any decent system of ordered liberty." *Milkovich,* 497 U.S. at 22, 110 S.Ct. 2695. Thus, the high Court has stated that a balance must be struck between the First Amendment's guarantee of freedom of expression and the states' right to offer protection to a citizen's reputation via a defamation action. *See id.* at 23, 110 S.Ct. 2695; *see also Gertz,* 418 U.S. at 343, 94 S.Ct. 2997.

In synthesizing the numerous cases from the U.S. Supreme Court regarding the First Amendment's interaction with state causes of action for defamation, we arrive at the following conclusions. First, the U.S. Supreme Court has, pursuant to the actual malice standard, provided considerable protection to defendants in defamation actions filed by public officials and public figures. The actual malice standard goes so far as to forbid imposition of liability even in those instances where the defendant negligently publishes false, defamatory statements about a public figure or public official. Yet, the high Court has not declared that the media, because of their special role in our democracy, enjoy a blanket immunity from suit. In fact, it has most clearly stated that the First Amendment does not confer this type of protection upon the media. A primary reason for rejecting such a sweeping privilege for the media is the concern that such a privilege would essentially obliterate the states' power to provide protection, via defamation actions, to a person's reputation; the high Court has explicitly stated that it places value on a person's right to protect his reputation. Finally, in no case has the high Court declared that a defendant will be immune from suit even where a public official-plaintiff could prove that a defendant published with actual malice.

Accordingly, we conclude that the existing case law from the U.S. Supreme Court indicates that the high Court would not so sharply tilt the balance against the protection of reputation, and in favor of protecting the media, so as to jettison the actual malice standard in favor of the neutral reportage doctrine. Rather, the U.S. Supreme Court has placed a burden

(albeit a minimal one) on the media to refrain from publishing reports that they know to be false or that they published with reckless disregard of whether it was false. In light ·of the high Court's consistent application of the actual malice standard in these types of cases, and its cautions that free expression law should be balanced against, and not be allowed to obliterate, state law protections to reputation, we cannot logically conclude that the high Court would abandon the actual malice standard.

Furthermore, to the extent that the Media Defendants' argument can be characterized as a plea for us to effectuate important public policy goals by charting a new course with regard to federal constitutional law, one apart from that set by the U.S. Supreme Court, we resoundingly reject it. This is not to say that the Media Defendants' position regarding the provision of newsworthy information to the body politic does not have some visceral appeal. Yet, our role in these matters is not to champion what we perceive to be good public policy. Rather, our function, as a state supreme court examining a federal constitutional question on which the U.S. Supreme Court has not yet spoken, is to attempt to anticipate how the federal high Court would dispose of this issue. As detailed *supra*, our examination leads us to the conclusion that the U.S. Supreme Court will not adopt the neutral reportage doctrine.

 Having determined that the First Amendment does not mandate adoption of the neutral reportage privilege, we now turn to the Media Defendants' claim that the privilege is encompassed within the Pennsylvania Constitution's free expression provision.[9] The Media Defendants, along with *amicus curiae* the Committee of Seventy, present impassioned, erudite arguments detailing how this court has often found that the Pennsylvania Constitution provides greater free speech rights than does the United States Constitution. Resting on this rich history of independent state constitutional law, they assert that even if the United States Constitution's protection of free expression does not encompass the neutral

9. The free expression clause of the Pennsylvania Constitution is contained in Article 1, section 7.

reportage privilege, we should find that the Pennsylvania Constitution does.

The Media Defendants and the Committee of Seventy are correct in their assertion that this court has often declared that the Pennsylvania Constitution recognizes broader free expression rights than does the federal constitution. *See, e.g., Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591 (2002). Yet, their lengthy recitation of the law fails to recognize the existence of *Sprague v. Walter,* 518 Pa. 425, 543 A.2d 1078 (1988). This is a significant gap in their analysis as it is *Sprague* which controls whether the Pennsylvania Constitution provides broader free expression protections in these matters than does the federal Constitution.

In *Sprague,* the plaintiff was a public official who sued a newspaper for printing an article which allegedly defamed the plaintiff. In this context, the *Sprague* court addressed the issue of whether the federal Constitution provides that representations made by a confidential source are presumptively valid. We concluded that the free expression rights accorded by the U.S. Constitution were not so expansive.

The *Sprague* court next considered whether the Pennsylvania Constitution provides broader protections to the media in a defamation action filed by a public official than does the federal Constitution. In discussing the free expression rights guaranteed by the Pennsylvania Constitution, we recognized that these rights are in tension with another right guaranteed by our commonwealth's constitution, namely the right to protect one's reputation.[10]

The *Sprague* court was keenly aware of the seesawing balance between the constitutional rights of freedom of expression and of safeguarding one's reputation: protection of one of those rights quite often leads to diminution of the other. Yet, in the quest to strike a balance between these two competing protections, our court cautioned that the freedom of expression should not be seen as dominant and the protection

10. The right to preserve one's reputation is contained in Article I, section 1 of the Pennsylvania Constitution.

of reputation as inferior. We stressed that the right to protect one's reputation is not a second-class right, amenable to being pressed into oblivion by other constitutional provisions. We made it plain that "a person's interest in his or her reputation has been placed in the same category with life, liberty and property." *Id.* (citations omitted). Thus, we concluded the constitutional interest in providing for the free flow of information was not so absolute that it granted "a license to the media to use information recklessly and/or maliciously to destroy the reputation of a citizen." *Id.* Rather, a balance must be struck between these two constitutional rights.

In striking that balance, we reasoned that we could not interpret our state constitution as providing even broader free expression rights than does its federal counterpart. We noted that the U.S. Supreme Court had erected "stringent requirements" in order to protect the federal right of free expression. Were we to go beyond the U.S. Supreme Court, and grant even broader free expression protections in defamation actions, we would concomitantly—and impermissibly—infringe on the protection granted by the Pennsylvania Constitution to reputation. *Id.* at 1085. Essentially, we determined that the protections accorded at that time by the U.S. Supreme Court to the right of free expression in defamation actions would demarcate the outer boundaries of our Commonwealth's free expression provision.

In accordance with *Sprague,* we find that with regard to the neutral reportage doctrine, the Pennsylvania Constitution's protection of free expression is no broader than its counterpart in the federal Constitution. And, since we have found that the First Amendment does not encompass this privilege, we conclude that the Pennsylvania Constitution does not as well.

Accordingly, we hold that neither the United States nor the Pennsylvania Constitutions mandate adoption of the neutral reportage doctrine. The order of the Superior Court is affirmed.

Former Justice Lamb did not participate in the decision of this case.

Justice CASTILLE files a concurring opinion.

Justice CASTILLE concurring.

I join the Majority Opinion with the single exception of the discussion in footnote 6 of the fair report privilege, which I believe warrants elaboration for purposes of retrial. I write separately to address two points: (1) my own view of the neutral report privilege; and (2) what role may be played upon remand by the related, but distinct, fair report privilege under Pennsylvania law.

The single issue accepted for review in this discretionary appeal is whether the neutral report privilege is viable in Pennsylvania under either the First Amendment of the U.S. Constitution or Article I, Section 7 of the Pennsylvania Constitution. I agree with the Majority Opinion that, under current authority from the U.S. Supreme Court, the First Amendment cannot be said to encompass such a privilege. I also agree that, since any innovation in this area would mark a distinct break from the U.S. Supreme Court's current analytical approach, such innovation should come from the High Court. I also agree with the Majority that there is no basis to construe the Pennsylvania Constitution separately, *i.e.*, as if it provided absolute protection for "neutral" reportage of defamatory but "newsworthy" information. Mr. Chief Justice Cappy's learned Majority Opinion reflects a characteristically comprehensive survey of the current state of the governing law involving the neutral report privilege; and the Chief Justice's review persuasively demonstrates why that jurisprudence requires a conclusion that the newspaper article in question is not protected by the neutral report privilege.

If this Court truly were unfettered in its evaluation of the jurisprudential soundness of the neutral report privilege, I believe that there is much to be said, as a theoretical matter, in favor of recognizing a First Amendment privilege to fairly and accurately report newsworthy events—at least where, as

here, the event not only is newsworthy but also pertains to matters involving the official conduct of elected public officials. However, the neutral report privilege has never been embraced by the U.S. Supreme Court, so there is no overarching governing definition of its scope and contours. The leading case on the subject is the Second Circuit Court of Appeals' decision in *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir.1977), which provides the following description of the privilege:

> [W]hen a responsible, prominent organization ... makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private view regarding their validity. What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the first amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation. The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them.

*Id.* at 120 (further citations omitted).

The case *sub judice* involves more than a sensitive issue of public interest or controversy. Here, the article concerned the acrimonious fallout from a special meeting of the Parkesburg Borough Council, and it reported defamatory comments that Glenn, an elected borough councilman, made concerning the elected council president and the borough mayor. Absent some special circumstance (such as editorial adoption or apparent approval of the contents of the reported comments), the purpose for which a newspaper reports and disseminates such information is not the same defamatory purpose existing in the mind of the elected official/speaker. The very fact that, in response to official government proceedings such as the council meeting here, an elected public official would act in

such a scurrilous manner as to call a fellow councilman and the local mayor "queers" and "child molesters," accuse the council president of inappropriate sexual overtures, falsely accuse the mayor and council president of having a homosexual affair and conspiring against him, etc., is not only newsworthy, but a matter of importance to voters. The report conveys information concerning the fitness of that elected public official to continue in office. I concur in the approach of the trial court in finding that such a report should be protected by a First Amendment-based privilege.

I am concerned also with the practical difficulties the press will encounter in trying to walk the very fine line between accurately reporting public governance-related comments such as these, while avoiding liability for doing so. Absent a privilege, the newspaper may be forced to sanitize the report or resort to vagaries—highly subjective changes which inevitably will operate to mislead the public as to the seriousness or rashness of the accusations. Moreover, by forcing newspapers to recharacterize what actually occurred, the absence of a privilege essentially requires the substitution of editorial opinion for accurate transcription. Such a transformation of the actual event inevitably alters its context and content. In addition to being inaccurate, news reports altered for fear of litigation would be of far lesser value to the general public in learning of and passing upon the appropriateness of the public behavior of their elected officials. Such a stilted reporting regime would contravene the United States Supreme Court's seminal statement that "debate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Having said this, I nonetheless remain satisfied with the Majority's assessment of existing U.S. Supreme Court precedent and its conclusion that this precedent militates against this Court embracing the neutral report privilege. The U.S. Supreme Court has not yet, and may never, embrace the

extension of First Amendment protection that would be represented by adopting the privilege. I believe that such an extension, if to be recognized at all, should originate with the High Court.

I also agree with the Majority that, in this particular instance, there is no basis for concluding that a greater protection for the newspaper, in the form of a neutral report privilege, exists under Article I, Section 7 of the Pennsylvania Constitution. In this regard, *Sprague v. Walter,* 518 Pa. 425, 543 A.2d 1078 (1988) is essential as that case recognizes that, in the defamation arena, there are interests other than free and unfettered speech interests which are implicated in a Pennsylvania constitutional analysis—such as the interest in one's good reputation. In *Sprague,* this Court addressed the Shield Law privilege, 42 Pa.C.S. § 5942, which affords the media a right to conceal the identity of confidential sources. We found that the statute did not translate into a broader presumption that information received from such sources was reliable, and thus a defamation plaintiff may challenge the reliability of the information received or the credibility of the source. 543 A.2d at 1083, 1086. Thus, *Sprague* recognized that the right to free speech and the interest in free-flowing information does not necessarily outweigh the interest an individual has in protecting his or her own good reputation. *Id.* at 1084–85. As a result, the *Sprague* Court declined to find greater protection for free expression in defamation actions under the Pennsylvania Constitution.[1]

1. Even in the absence of a neutral report privilege, I note that appellees will have a heavy burden at retrial, where the *New York Times v. Sullivan* actual malice standard will govern. In this regard, it is notable that, in the *New York Times* case itself, the Court approved of the following charge to the jury in an analogous situation:

[W]here an article is published and circulated among voters for the sole purpose of giving wha[t] the defendant believes to be truthful information concerning a candidate for public office and for the purpose of enabling such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principle matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in such a case, the burden is on the plaintiff to show actual malice in the publication of the article.

234

Turning to footnote 6 of the Majority Opinion, the Majority notes that, in recognizing a neutral report privilege, the trial court conflated that doctrine with the separate and distinct fair report doctrine. The question of whether the account in this case was separately protected by the fair report privilege apparently was raised by appellants in the Superior Court, but not reached by the panel majority, although it was discussed in Judge (former Justice) Montemuro's concurring opinion. The question was then raised in appellants' allocatur petition as a distinct claim for review, but this Court did not grant review on the issue.

I write to emphasize that the fact that the applicability of the fair report privilege has not been squarely addressed at the appellate level will not preclude appellants from raising that distinct privilege upon retrial. The fair report privilege is a settled aspect of Pennsylvania law; that the trial court conflated the two doctrines cannot preclude appellants from invoking the doctrine upon remand.

The fair report privilege was embraced by this Court over forty years ago—indeed, even before the decision in *New York Times*—in *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963), which held that:

> [A] newspaper has the privilege to report the acts of the executive or administrative officials of government.... If the newspaper account is fair, accurate and complete, and not published solely for the purpose of causing harm to the person defamed, it is privileged and no responsibility attaches, even though information contained therein is false or inaccurate.

*Sciandra,* 187 A.2d at 588–89 (citations omitted).[2] The definition of the fair report privilege adopted by *Sciandra* derived from Section 611 of the Restatement (First) of Torts:

376 U.S. at 280–81, 84 S.Ct. 710.

**2.** I note that nothing in this Court's decision in *Sprague* called into question the availability of the fair report privilege in appropriate circumstances.

The publication of a report of judicial proceedings, or proceedings of a legislative or administrative body or an executive officer of the United States, a State or Territory thereof, or a municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter which is false and defamatory, if it is

(a) accurate and complete or a fair abridgment of such proceedings, and

(b) not made solely for the purpose of causing harm to the person defamed.

Following *Sciandra,* the fair report privilege became well-established as a part of the free speech law of Pennsylvania. *See e.g., Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 275 A.2d 53 (1971) (applying fair report privilege with citation to Restatement (First) Torts); *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 191 A.2d 662, 667 (1963) (analyzing radio station's comments about judicial proceeding under Section 611 fair report privilege); *Rosenbloom v. Metromedia,* 403 U.S. 29, 37–38, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) ("Pennsylvania law recognizes ... a conditional privilege for news media to report judicial, administrative, or legislative proceedings if the account is fair and accurate, and not published solely for the purpose of causing harm to the person defamed, even though the official information is false or inaccurate.").

In 1977, the Restatement (Second) of Torts broadened Section 611 to include reports of any official action or proceeding and any meeting open to the public. Notably, the Second Restatement also eliminated the requirement that the publication not be made solely for the purpose of causing harm:

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) of Torts § 611 (1977). The fair report privilege has continued to be recognized and successfully

advanced by the media in Pennsylvania cases, albeit this Court has not expressly adopted and applied the Second Restatement formulation. *Curran v. Philadelphia Newspapers, Inc.,* 497 Pa. 163, 439 A.2d 652 (1981) (fair report privilege of Restatement (Second) Torts *would have applied* to newspaper's report of comments at press conference *if* report was fair and accurate); *DeMary v. Latrobe Printing and Publishing Company,* 762 A.2d 758 (Pa.Super.2000) (*en banc*), *appeal denied,* 567 Pa. 725, 786 A.2d 988 (2001) (issue involving fair report privilege should go to jury; citing Restatement (First) Torts); *Williams v. WCAU–TV,* 555 F.Supp. 198 (E.D.Pa. 1983) (predicting Pennsylvania will adopt Section 611 of Restatement (Second) Torts formulation and applying that privilege).

In his concurring opinion below, Judge Montemuro described the practical operation of the fair report privilege, as follows:

> The privilege may be forfeited by a publisher who exaggerates or embellishes its account of the occasion ... which must be "fair, accurate and complete." *Sciandra,* 187 A.2d at 589. Publication of defamatory material solely for the purpose of causing harm to the person defamed results in loss of the fair report privilege. *DeMary,* [762 A.2d] at 762. **Whether a privileged occasion occurred is a matter for the defendant to establish and for the trial court to decide, ... but whether abuse of the privilege has occurred is a question for the jury.** *DeMary,* [762 A.2d] at 763.

The *DeMary* Court held, albeit in the context of preliminary objections, that the burden of proof borne by a public figure in order to succeed in making out a defamation case against (a) media defendant[ ] requires two types of malice to be demonstrated. "First, in order to make a prima facie case the plaintiff must show that the newspaper acted with actual malice toward the truthfulness of the statement." *Id.* at 765. The ·actual malice referred to is that which was defined by the Supreme Court of the United States in *New York Times v. Sullivan* ..., as knowledge of the falsity of

the defamatory statements or reckless disregard for their truth or falsity. *DeMary,* [762 A.2d] at 764. "Second, to defeat the fair report privilege once it has been properly raised, the plaintiff must show that the defendant was motivated by ill will toward the plaintiff," *id.* at 765, that is, by common law malice. As the *DeMary* Court explains, "Actual malice focuses on the defendant's attitude toward the truth, whereas common law malice focuses on the defendant's attitude towards the plaintiff." *Id.* at 764.

797 A.2d at 298–99 (Montemuro, J., concurring) (emphasis supplied) (additional citations omitted).

Judge Montemuro went on to recognize that the trial judge's conflation of the unavailable neutral report privilege with the recognized fair report privilege would not have necessitated reversal in this case if the court's actions in ruling on evidentiary questions and instructing the jury would have conformed with the requirements of the fair report privilege; in that instance, the only error would have been one of nomenclature. Ultimately, Judge Montemuro concluded that the distinct nature of the two doctrines rendered the court's rulings erroneous under the fair report privilege and thus, he concurred in the award of a new trial.

I agree with Judge Montemuro's analysis. With the fair report privilege, assuming a privileged occasion, the question of an abuse of the privilege is for the jury, and evidence of actual and common law malice is admissible. The rulings at trial excluded such evidence; hence, the verdict cannot stand.

With respect to the legal question of whether a "privileged occasion" is at issue for purposes of the fair report doctrine, that is a matter which was not passed upon by the trial court under the proper standard and it is a matter properly left to that court in the first instance—particularly given the limited appellate posture in which the case is before this Court. I am aware that the event at issue here does not fit within the classic expression of the privilege: *i.e.,* the report was not an account of what occurred within the special council meeting itself. Nevertheless, appellants should be permitted an oppor-

tunity to demonstrate that the event reported—the defamatory comments of a public official immediately after official proceedings of a public meeting had ended—falls comfortably within the doctrine. In this regard, it is notable that the Comments to the Second Restatement suggest no requirement that the reported statements be made during an official public meeting. Rather, the privilege is deemed to "extend[ ] to the report of . . . any action taken by any officer . . . of any State or of any of its subdivisions." Restatement (Second) of Torts § 611, Comment d.[3] This rationale comports with the concerns I have expressed earlier (albeit concerning the neutral report privilege) that reports of matters affecting core democratic values such as the public's right to be informed concerning the public acts and comments of public officials implicating their fitness to serve, are deserving of special protection. I believe that a legitimate argument can be forwarded that the fair report privilege applies to the publication of Glenn's communications made outside of this meeting. *See Curran*, 439 A.2d at 661–62.

---

**3.** Glenn's action here—communicating false statements to a reporter about fellow council members—arguably was an official one, that is, "to defend himself." N.T. Mar. 27, 2000, at p. 113.